## Cubit *v.* Philadelphia, Appellant.

Argued December 13, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Samuel P. Lavine,* with him *John V. Horan,* Assistant City Solicitors, and *Joseph Sharfsin,* City Solicitor, for appellant.

*George W. Hoft,* for appellee.

OPINION BY CUNNINGHAM, J., January 30, 1940:

The City of Philadelphia is the employer in this workmen's compensation case. It has appealed from a judgment entered against it in the court below upon an award of compensation to the widow and minor children of William Cubit for his death on May 30, 1937, from a bullet wound in his head, admittedly self-inflicted on the previous evening.

It is provided in Section 301 of the Workmen's Compensation Act of June 2, 1915, P. L. 736, 77 PS §431, that "no compensation shall be made when the injury or death be intentionally self-inflicted, but the burden of proof of such fact shall be upon the employer." The basis of the award of the referee, affirmed by the board, and upon which judgment was entered by the court below without an opinion was that the death was not *intentionally* self-inflicted. It was held to be compensable because, as expressed by the referee, "the decedent took his life in a fit of temporary insanity which was induced by [an] accident" suffered on January 9, 1937, in the course of his employment as a police officer of the city.

Cubit, thirty-seven years of age, had been employed for eight years as a policeman, and on the night of the accident was the driver of a patrol wagon. The description of the occurrence, as given by a fellow officer employed upon the same wagon, was that shortly after the wagon had returned to a patrol house he found Cubit lying on the garage floor where he had fallen through tripping over the step in the rear of the vehicle. It is conceded that the decedent received at that time an accidental injury to his head which caused a "cerebral

concussion." In the claim petition it was averred that as a result of the accident Cubit's "mind became deranged and he shot himself." In addition to denying in its answer that the "decedent died as the result of the [accident]," the city averred that his death resulted from an independent and unconnected cause—"a self-inflicted gun shot wound."

We are not satisfied, from our review of the record, that the claimant successfully carried the burden imposed upon her under the issue thus framed and the admission that death was self-inflicted, or that the controlling findings of fact of the referee, adopted by the board, are supported by competent evidence.

With relation to the period of nearly five months intervening between the accident and Cubit's death, there is uncontroverted evidence that he was admitted to the Philadelphia General Hospital on the day following the accident and there came under the care of Dr. Samuel B. Hadden, the consulting neurologist to the Department of Public Safety. He was discharged from the hospital on January 21st, as "improved but not regarded as entirely well," and directed to report from time to time to the chief surgeon's office. With respect to the decedent's condition at the time of and following his discharge from the hospital, Dr. Hadden testified: "A. My diagnosis was post-traumatic psychosis at the time I was seeing him, I mean, in view of the fact that his mental condition observed in the hospital shortly after the accident did not improve rapidly and could be classified as a psychosis, it was diagnosed as a post-traumatic psychosis. Q. How did that condition manifest itself in Mr. Cubit? A. He continued to complain of rather severe headaches and he was rather drowsy; at times apathetic. It was difficult for you to maintain his attention; had difficulty in concentrating, and those were the things that were noted. Q. Would you say those things would naturally follow from a

blow on the head? A. Frequently they are seen following injury to the head."

At the direction of Dr. Hadden the decedent returned to light duty at the police station but was never able to perform full duty. There is also lay testimony that during that period he frequently suffered severe pains in his head and about a week before his death in describing these pains remarked to his brother-in-law, Joseph Kelly, "I have to beat my head on the wall and hit my head with my fist. I don't think I will ever get better." Referring to another visit to the decedent at his home Kelly testified Cubit "put both his fists up to his forehead and kept punching himself."

The findings of the referee to which we have referred as having been adopted by the board read:

"12. That as a result of the accident which the said William Cubit suffered on the 9th day of January, 1937, together with his anxiety and worry over his condition, as well as the concussion of the brain which he suffered, the said William Cubit became temporarily mentally deranged.

"13. That while in a fit of mental derangement which was so severe as to deprive him of his sanity and will, the said William Cubit on the 29th day of May, 1937, shot himself in the forehead as a result of which he immediately died.

"14. That the death certificate issued in this case certified that the said William Cubit took his life in a fit of temporary insanity."

There is no competent evidence upon the record supporting the above finding relative to the death certificate. The claimant testified she had a death certificate at home upon which it was stated that decedent "was temporarily insane." This certificate was not produced and we therefore need not consider whether, if offered, it would have been competent evidence of anything more than the fact of death.

The issue before the referee was, as indicated by our Supreme Court in the case of *Lupfer v. Baldwin Locomotive Works,* 269 Pa. 275, 112 A. 458, whether the decedent "killed himself while possessed by an uncontrollable insane impulse, or while in a delirium, or frenzy, without rational knowledge of the physical consequences of his act." See also *Gasperin v. Consolidated Coal Co.,* 293 Pa. 589, 143 A. 187. In *Daniels v. New York, N. H. & H. R. Co.,* 183 Mass. 393, 62 L. R. A. 751, 67 N. E. 424, it was said, "An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues."

No evidence was offered by the city and when the testimony by and on behalf of the claimant, with relation to decedent's mental condition and actions during the forty-eight hours preceding his suicide, is examined in the light of the above principles this situation is disclosed. Claimant's own testimony is so vague, indefinite and lacking in detail, that it does not bring her case within the scope of the opinion in the Lupfer case. She testified her husband went to the office of Dr. Hadden by himself on May 28th and upon his return told her the doctor had recommended that he do some light work and expressed his desire to comply with the suggestion. Referring to the morning of the day of the tragedy, May 29th, claimant testified her husband went to work about nine o'clock in the morning; that he "looked all right" at that time but had complained of not having slept during the night. Her further testimony was that about two o'clock in the afternoon he was brought home by Robert McCullough, the fellow police officer to whose description of the accident we have above referred. McCullough testified that during the forenoon of the 29th decedent was "going around the patrol house and sitting there and talking"; that "his eyes seemed to be glassy,

a different stare to them than they naturally would be"; that while sitting in a chair he "just like fainted and fell forward" and that he took decedent home during the afternoon. Claimant's testimony continued: "Q. You say when he came home on the afternoon of the 29th he went to bed? A. Mr. McCullough and myself tried to put him to bed and he insisted he could not sleep with his head hurting so much. Q. Call a doctor at that time? A. No. Q. He was complaining pretty much about his head? A. Yes, he took some medicine what Dr. Owens (the chief surgeon) had given him."

Her only description of the events immediately preceding the shooting was that after her husband had been brought home and McCullough had gone, "He (decedent) said his head was bothering him and couldn't lay down and went out for a walk and after he came back he was still the same, so later on his head kept on bothering him and he was going to bed and couldn't sleep and when I went out and when I came back his head was bothering him so much he was hitting it against the doors and he just shot himself. Q. Did you see him striking his head against the doors? A. Yes. Q. Which part of his head was he striking—the front part? A. He used to do it all the time—hit his head against the wall. Q. Where did you find him? A. In the cellar. By the referee: Q. Where was the wound? A. In his head." Claimant's testimony is lacking as to any details with respect to the time of the shooting, the occasion for going to the cellar, her whereabouts at the time, or what, if anything, was said by decedent.

It is apparent from the testimony of Samuel Langraf, a friend of decedent, that on the evening of the 29th Cubit visited the home of the witness. An excerpt from his testimony reads: "Q. When [was] the last time you saw him before he shot himself? A. That evening. Q. He was up and speaking to you that evening? A. He was there when I came home from work. Q. How

long did he spend with you? A. Left about two minutes after I got in. Q. Converse with him? A. Just said 'Hello'. Q. Seem rational? A. Yes, but he usually talked, but didn't then. Q. Able to talk intelligently? A. Yes. Q. And that was shortly before he died? A. That is right."

Albert Kelly, another brother-in-law of decedent, referring to the evening of the 29th, testified: "Q. You saw him the night he died? A. No. Q. When [was] the last time you saw him? A. The day before. I called him up about 7 o'clock. Q. The day before? A. The same night. Q. That he died? A. Yes. Q. On the 'phone'? A. Yes. Q. Talking to him? A. Yes. Q. He answered your questions all right? A. Yes, he did. I asked him did he want to go down [to] Jersey—down to my mother's. He said, 'No, I am going down to-morrow.' "

We think this is a case in which the testimony of expert medical witnesses was necessary upon the question of any causal connection between the accident and the death alleged to have resulted therefrom. Here, the death was not so directly or naturally and probably the result of the accident as to relieve the claimant from the necessity of presenting expert testimony. In this respect the present case differs from that of *Johnson v. Valvoline Oil Co. et al.,* 131 Pa. Superior Ct. 266, 200 A. 224, where the subject is discussed.

Dr. Hadden was the only medical expert called by claimant. We have already referred to his diagnosis of the effect of the accident upon decedent's mental condition. As testified to by claimant, decedent visited his office during the day preceding his suicide. With respect to that visit, Dr. Hadden testified: "Q. On what date was the last time you saw him? A. On the 28th of May. Q. What was his condition at that time with regard to being non compos mentis? A. He was still rather retarded. His responses came slowly, seemed to

have considerable difficulty in concentrating and as a result of this I felt he was not quite competent to return to regular active duty and I increased this man's duty to light active duty such as watching some city property,—not the full responsibility of walking a beat. ...... Q. He was confused? A. The facility of use of his mental facilities (faculties?) was impaired. He was slow to respond and appeared to have great difficulty in concentrating and he was quite anxious and worried about himself."

Upon the question of a causal connection between the accident of January 9th and the death of the employee on May 30th, Dr. Hadden, while under examination by the referee, testified: "Q. You have stated that there was a cerebral concussion and you have stated from ailments the man had in connection with the head injury, and you are familiar with the history of the case which wound up in the man eventually committing suicide for some reason on May 29, 1937,—after giving everything consideration of the condition of the man and the subsequent event, in your opinion is there any causal connection with the act of the man on May 29th and the injury to his head which he had in the original accident? A. *It is impossible to answer the question with any degree of definiteness.* I cannot say that his accident was or was not the thing, a causal relationship to his eventual death. I can only say I feel his accident caused the condition which, or I assume it caused the condition, I observed on January 11th and subsequent to that date and assuming that before the accident he was well and there were no other factors which lead to a depressed type of psychosis, but we are limited to information as to whether or not he was well before, whether there were other factors that might precipitate a similar situation. We can only assume that if there were no such factors, then the accident was the thing, in all *probability* the one factor, which produced the

situation. ...... (By counsel for claimant): Q. In the conclusion which you have made could you further add the statement that the act was caused by an uncontrollable impulse? A. We can only say that as a result of any emotional state judgment may be temporarily suspended in the man so depressed, his normal judgment, that is, as we know him in his normal state, that would not permit him to consider suicide. Under intense emotion we can temporarily lose the proper exercise of our judgment. ...... (By the referee): Q. Have you known of cases where a man with a serious cerebral concussion has eventually ended in insanity? A. Yes, I have known of a few." (Italics supplied)

The claimant testified that the general condition of her husband's health prior to the accident of January 9th had been good. Assuming, as we may under the lay testimony on the record, that decedent's health had been normal prior to the accident in the garage, the medical testimony adduced by claimant does not fully measure up to the standard now required by our appellate decisions: *Elonis v. Lytle Coal Co.*, 134 Pa. Superior Ct. 264, 3 A. 2d 995.

The most that Dr. Hadden seems to have been willing to say was that decedent "was mentally disturbed as a result *probably* of the accident," and that "the accident was the thing, in all *probability* the one factor, which produced the situation," terminating in the suicide. We are unable to find in the record a definite expression, in any form, by Dr. Hadden that in his opinion the death resulted from the accident. We cannot escape the conclusion that the testimony by and on behalf of the claimant now upon the record does not support the finding of the referee that the decedent "while in a fit of mental derangement which was so severe as to deprive him of his sanity and will" shot himself. That is, it does not support a finding that the act of the decedent was involuntary in the sense that he was unable to appreci-

ate its consequences, or, in the language of the Lupfer case, that it was committed while he was "possessed by an uncontrollable insane impulse, or while in a delirium, or frenzy, without rational knowledge of the physical consequences of his act." We think the court below should therefore have sustained the city's exceptions to the action of the board, predicated, as they were, upon the contention that the controlling findings of fact were not supported by competent evidence.

It does not follow, however, that judgment should have been entered in favor of the city. In our opinion this is a case in which the court below should have remitted the record to the board "for further hearing and determination" as provided in Section 6 of the amendatory Act of June 26, 1919, P. L. 642, 666, 77 PS §879, because it falls within the principles discussed by our Supreme Court in *Vorbnoff v. Mesta Machine Co. et al.,* 286 Pa. 199, 209-211, 133 A. 256, and summarized in *Carville v. Bornot & Co.,* 288 Pa. 104, 109-110, 135 A. 652.

Although the testimony now before us does not support the findings of the compensation authorities, it does not exclude the possibility that the death was involuntary in the sense above indicated. Our present view is that claimant, if afforded an opportunity, may be able to testify in greater detail to the circumstances immediately preceding her husband's death and to prove such additional facts as would form a basis for expert medical testimony which would meet the requirements of the case as we have indicated them.

The judgment of the court below is reversed and the record remitted to that tribunal to the end that it may be returned to the board for further proceedings not inconsistent with this opinion.