Kasman, Appellant, *v.* Hillman Coal & Coke Company.

Argued April 23, 1942.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, RHODES, HIRT and KENWORTHEY, JJ.

*Paul N. Barna,* for appellant.

*R. M. Steffler,* with him *Rufus S. Marriner,* for appellee.

OPINION BY CUNNINGHAM, J., July 23, 1942:

This is another of those utterly futile appeals in a workmen's compensation case by which we are asked to invade the exclusive province of the compensation authorities and reverse a finding made against the claimant by a referee, and adopted by the board, upon the controlling medical issue of fact, although it is fully supported by the testimony of the attending physician and another medical expert. We have repeatedly held that where there is competent and substantial evidence on the record sufficient to sustain the findings of the board, as the ultimate fact-finding tribunal, they are conclusive and cannot be disturbed, either by the common pleas or this court, even though the record may contain, as it does in this case, other competent evidence which, if the board had accepted it, would have justified different findings: *Corrento v. Ventresca et al.,* 144 Pa. Superior Ct. 358, 362, 19 A. 2d 746; *Eckenroad v. Rochester & Pittsburgh Coal Company,* 149 Pa. Superior Ct. 257, 27 A. 2d 759.

GIBSON, J., of the court below, thus expressed the principle: "The findings of the compensation authorities based on competent evidence must be sustained unless it appears that the inevitable conclusion from the facts presented is to the contrary: *Hunter v. American Oil Co. et al.,* 136 Pa. Superior Ct. 563; *Ford v. A. E. Dick Co.,* 288 Pa. 140."

The profession should realize by this time that where the board has found the facts against the party having the burden of proof an appeal is a waste of time, effort

and money, unless the appellant can demonstrate that the record is devoid of any substantial and competent evidence sustaining such findings, or that the law has been improperly applied to the facts as found.

The pivotal issue of fact upon which this case must turn arose out of these circumstances: While in the course of his employment as a loader in one of the defendant company's mines on February 27, 1935, claimant's husband, John Kasman, sustained severe accidental injuries to his back through a fall of coal from the roof of the mine. Dr. J. A. Krosnoff, who treated Kasman at the company's first-aid room, and later had X-ray pictures made, testified: "There was a fracture of the body of the second and third lumbar vertebrae; also a fracture of both transverse processes of the third lumbar vertebra, and a fracture of the transverse process on the left side of the fourth and fifth lumbar vertebrae. There was marked lateral curvature to the right." Another witness for claimant, Dr. A. S. Sickman, testified that check-up pictures taken in October, 1935, showed "all fractures were united." Under an open agreement, Kasman was paid compensation for total disability until his death on Sunday, September 13, 1936, from an admittedly self-inflicted bullet wound in his abdomen.

Section 301 of the Workmen's Compensation Act of June 2, 1915, P. L. 736, 77 PS §431, then in force, provides that "no compensation shall be made when the injury or death be intentionally self-inflicted, but the burden of proof of such fact shall be upon the employer."

On January 29, 1937, claimant filed her claim-petition for herself, as Kasman's widow, and on behalf of three dependent minor children. Under its averments, she relieved the defendant employer of its statutory burden of proving her husband's death was self-inflicted, and sought compensation upon the ground

that his death was not intentional, but was attributable to the injuries sustained by him in the accident of February 27, 1935, which "caus[ed] him to later commit suicide."

The employer's answer denied the injuries referred to in the petition caused Kasman to commit suicide and alleged "there was no connection whatever between the accident . . . . . . and the subsequent suicide."

Under the issue thus framed the burden assumed by claimant has been clearly defined in prior decisions. In order to obtain an award it was incumbent upon her to show, as a matter of fact, that her husband "killed himself while possessed by an uncontrollable insane impulse, or while in a delirium, or frenzy, without rational knowledge of the physical consequences of his act": *Lupfer v. Baldwin Locomotive Works*, 269 Pa. 275, 112 A. 458; *Gasperin v. Consolidated Coal Co.*, 293 Pa. 589, 143 A. 187; *Cubit v. Philadelphia*, 138 Pa. Superior Ct. 325, 10 A. 2d 853.

The result of hearings before Referee Capano in 1937 and 1938 was an award of compensation based upon the testimony of claimant and other members of the family that Kasman was "sort of broody, morose and blue"; moaned and cried out in his sleep, "my back, my back"; and said, "Oh, why can't I die." The award was not supported by any definite medical testimony. Upon the appeal of the employer, the board, being properly of opinion that in this, as in the Cubit case, medical testimony upon the controlling issue of fact was essential, remanded the record to Referee Gibb, Capano's successor, with instructions to appoint an impartial medical expert and take additional testimony.

Hearings were conducted by Referee Gibb in June and October, 1940. Based upon the record as completed before him, the referee found in his eighth finding of fact: "John Kasman, decedent, was mentally

sane and came to his death from gun-shot wounds which were intentionally self-inflicted." An order of disallowance of the claim was accordingly entered.

The board, upon claimant's appeal to it, adopted the referee's findings of fact and conclusions of law; the court below affirmed the action of the board, and the claimant now appeals to us from the judgment entered in favor of the defendant company.

Relative to the circumstances immediately preceding Kasman's death, claimant testified she arose early that morning, made the fire and then some breakfast which her husband, who came downstairs shortly afterwards, did not eat; she then did some milking and fed the chickens while decedent watched her for a time and also talked to a neighbor named Dougherty; he also spent part of the morning sitting downstairs smoking and shortly before eleven o'clock asked claimant for some clean clothes, dressed himself in them and left the house. Thereafter the decedent was not seen alive by anyone; claimant and some of the children searched for him unsuccessfully at dinner time; about four o'clock claimant herself found his body in a cornfield some 300 feet from the house; there was a bullet wound in his abdomen and a revolver lay at his side.

The findings of the compensation authorities are justified by the testimony of these witnesses called by the defendant company:

Decedent's neighbor, Neal Dougherty, testified he had talked with Kasman during the morning of the day he shot himself—"bid him good morning" and held a brief conversation with him about some hogs belonging to the witness. His testimony then continued: "Q. What, if any difference, Mr. Dougherty, did you notice in carrying on conversations with him after he was injured than before he was injured? A. Well, he talked just the same when I talked to him. Q. Did you happen to ask him questions more than

once or ...... A. No, as long as he heard what I said; he was just the same."

Dr. R. E. Cummings testified he treated decedent who was confined to bed two or three months following the accident and then sent him to the hospital for the taking of the X-rays, etc; that after his discharge he gave decedent diathermy treatments "on an average of twice a week" and his ability to move was "decidedly improved" but he complained of pain. He further stated decedent usually walked from his home to the office of the witness—a distance of about a mile and a half—having called the day before his death to discuss sick benefits he thought he should receive from a lodge, showing, however, at that time only "the normal amount of resentment" over his failure to get them. According to Dr. Cummings, decedent's loss of weight was "very moderate, if any" and he was no more emaciated than in the preceding May; recovery was slow but normal and there were no complications, although he showed the "normal restlessness that a man feels over a protracted injury."

Excerpts from the testimony of Dr. Harold L. Mitchell, a specialist in mental and nervous diseases, of eighteen years' professional experience, read:

"Now, in this particular instance, there is nothing in the testimony that I read, and there is nothing in the additional testimony that has been cited to me this morning that would indicate, for instance, that this individual was confused; that he was disoriented, or not in contact with material things about his environment, or that he was [ir]rational or had an[y] hallucinations or any other fundamental or outstanding indications of major mental illness ...... Consequently, he knew what he was doing, and if he did destroy himself, he was conscious of that intent to. Q. He knew what the result would be from his actions? A. I think so ...... Q. Would you say then that his

death was caused by an uncontrollable impulse? A. No, I wouldn't say that."

A conflicting medical opinion was expressed by Dr. Stuart N. Rowe, the expert appointed by the referee. to the effect that when decedent committed suicide he was suffering from "a depression which had reached the point of being a true psychosis or insanity," brought about by the pain ensuing from his accidental injuries. It was within the exclusive province of the compensation authorities to weigh all the evidence upon the record and as the conclusion finally arrived at by them is supported by ample competent and substantial evidence it may not be disturbed. The assignments of error are severally overruled.

Judgment affirmed.