Stillman Unemployment Compensation Case.

Stillman et al., Appellants, *v.* Unemployment Compensation Board of Review.

Argued September 29, 1947. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Robert A. Wilson,* with him *Raymond P. Shafer, Joseph A. Padway* and *Sidney G. Handler,* for appellants.

*Richard H. Wagner,* with him *T. McKeen Chidsey,* Attorney General, for appellee.

*F. Joseph Thomas,* for employer.

OPINION BY RENO, J., January 8, 1948:

The board denied appellants' claims for unemployment compensation for four weeks after the waiting period of one week, holding that their unemployment during that time was due to the voluntary suspension of work resulting from an industrial dispute.

The sole question presented by their appeal is whether the board's findings of fact are supported by the evidence. The act provides: "In any appeal to the Superior Court the findings of the board or referee, as the case may be, as to the facts, if supported by the evidence and in the absence of fraud, shall be conclusive, and in such cases the jurisdiction of the court shall be confined to questions of law . . .": Unemployment Compensation Law, §510, 43 PS §830. See *Bonner v. Unemployment Compensation Board of Review,* 156 Pa. Superior Ct. 367, 40 A. 2d 106; *Hall v. Unemployment Compensation Board of Review,* 160 Pa. Superior Ct. 65, 49 A. 2d 872; *Dawkins Unemployment Compensation Case,* 160 Pa. Superior Ct. 501, 52 A. 2d 362. Where an act ascribes conclusiveness to evidentially supported

findings, substantial evidence is contemplated, that is, evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred. *Nat. Labor R. B. v. Columbian Enameling and Stamping Co.,* 306 U. S. 292, 59 S. Ct. 501; *Wilbert v. Com. of Pa. Second Injury Reserve Account,* 143 Pa. Superior Ct. 37, 17 A. 2d 732.

The pertinent statutory provision involved in this appeal is §402(d), 43 PS §802, added to the original legislation by the Act of April 23, 1942, P. L. 60, §4, and reduced to the form by which these claims are to be adjudged by the Act of May 29, 1945, P. L. 1145, §9. (The further amendment of June 30, 1947, Act No. 493, is not involved in this appeal.) The section provides: "An employe shall be ineligible for compensation for any week . . . (d) In which his unemployment is due to a voluntary suspension of work resulting from an industrial dispute, at the factory establishment or other premises at which he is or was last employed: Provided, That this disqualification shall apply only to any week of unemployment which, in whole or in part, includes any part of a period beginning with the day on which such suspension occurs and ending with (i) the last day of the fourth calendar week immediately following the calendar week in which such suspension occurs, or (ii) the day on which such suspension was terminated, whichever is the earlier."

It will be seen when we examine the facts that appellants' unemployment undoubtedly "resulted from an industrial dispute." But was it also "due to a *voluntary* suspension of work"? In this section "voluntary" has not been modified in subsequent amendments by "good cause", and such cases as *Teicher Unemployment Compensation Case,* 154 Pa. Superior Ct. 250, 35 A. 2d 739; *Sturdevant Unemployment Compensation Case,* 158 Pa. Superior Ct. 548, 45 A. 2d 898, and others of like import, are irrelevant. "Voluntary" in this context connotes a suspension of work resulting from the decision of the

employe, as distinguished from a dismissal or discharge or lay-off by the employer. Cf. *Department of Labor and Industry v. Unemployment Compensation Board of Review,* 133 Pa. Superior Ct. 518, 3 A. 2d 211. The task of the board was to ascertain from the evidence whether appellants' suspension of work was due to their decision or to some action by their employer.

The employer, Talon, Inc., operates plants in Meadville and Erie where it manufactures slide fasteners. At the time in question it employed 3200 persons at its Meadville plant and 700 at Erie. Most of the employes were members of various craft unions affiliated with the American Federation of Labor. There were 10 of these unions, and the number of employes holding membership in them ranged from one in the Pattern Makers Association, 350 in the Tool and Die Makers, and 1900 in the Slide Fasteners Union. After a probationary period, union membership was required by the employer as a condition of continued employment.

The Tool and Die Makers had been engaged in negotiating a new working agreement, and conferences having failed to produce results, the union voted to strike, and on October 24, 1945, at about 1 p. m. walked out of the Meadville plant. Three shifts were maintained: 7 a. m. to 3 p. m., 3 p. m. to 11 p. m., and 11 p. m. to 7 a. m. Some employes continued to work until 3 p. m. but none reported for the 3-11 p. m. shift. The subsequent events are fairly described in the pivotal finding of the board: "8. After the members of the Tool and Die Makers Union established a picket line at the Meadville plant, the other employes, who were members of affiliated unions of the American Federation of Labor, failed to report for work because of their unwillingness to cross the picket lines. The employer company was at all times ready and willing to continue operations, and would have been able to do so to a very considerable extent for some time after the strike by the Tool and Die Makers. No action was taken by the employer, nor

was any authorized action taken on its behalf, to close the plant or to afford a basis for a reasonable belief on the part of any employes that the plant had been closed to them. The failure of the employes to work was not in any measure due to the fact that they were prevented from working; there was no violence nor were there any threats of violence on the picket line. Their failure and refusal to work was due to (a) their objections, based upon principle, to crossing a picket line, and (b) their unwillingness to risk the consequences which might be imposed by their unions by reason of crossing the picket line."

The situation at the Erie plant was essentially similar to the conditions at Meadville, and it is covered by the finding: "9. The Tool and Die Makers went out on strike at the Erie plant on or about November 8, 1945. The company also was ready, able and willing to continue operations at this plant. The suspension at the Erie plant likewise resulted from the failure or refusal of the employes to report for work after the strike by the Tool and Die Makers at that plant. Their failure to work was based upon their objections in principle or their apprehension with regard to crossing a picket line."

The claimants charged and testified that the supervisory employes sent them home and told them not to return until the strike was over or until they were notified to return, that the plant gates were closed, that their machines were broken and in the absence of the die makers there was not one capable of repairing them, and that upon making calls to the plant they were informed there was no work.

To the contrary, the employer contended and its witnesses testified that it did nothing to prevent or discourage employes from returning to their work, that indeed it urged them to return and was ready, willing and able to resume production, that the gates were open and the guards were instructed to admit all employes who displayed badges, that its supervisors sent no one

home, and that it was informed by union officials that no union member would cross the die makers' picket line.

In the welter of the conflicting testimony the board could conceivably have found either way. But it found for the employer, and its findings are fully sustained and warranted by substantial and competent evidence, which requires no review beyond the above brief summarization. When we discover a rational basis for the findings of an administrative agency predicated upon substantial evidence our hand is stayed. The plain legislative mandate confines our review to questions of law, and we cannot disturb findings of fact even though the record may contain, as it does in this case, other competent evidence which, had it been accepted by the board, would have justified different findings. Nor are we at liberty to substitute our findings for those of the board even when our reading of the testimony might have brought us to a different conclusion. The credibility of the witnesses, the weight of their testimony, and the reasonable inferences to be drawn from it are for the board. Our duty is performed by studying the testimony in the light most favorable to the party in whose favor the board has found, giving that party the benefit of every inference which can be logically and reasonably drawn from it. These principles governing appellate review of the decisions of administrative agencies were largely developed in workmen's compensation cases, a comparable area of the law, and are applicable to appeals from the Unemployment Compensation Board of Review. See, e. g., *Kennedy v. Holmes Construction Co.,* 147 Pa. Superior Ct. 348, 24 A. 2d 451; *McMillan v. Wm. S. Miller Co.,* 149 Pa. Superior Ct. 241, 27 A. 2d 735; *Kasman v. Hillman Coal & Coke Co.,* 149 Pa. Superior Ct. 263, 27 A. 2d 762; *Carberry v. Reitz Furniture Co.,* 152 Pa. Superior Ct. 417, 33 A. 2d 289; *Kline v. Kiehl,* 157 Pa. Superior Ct. 392, 43 A. 2d 616.

The 24 appellants took a joint appeal. Some are die makers, some are members of the other unions, and two are not members of any union. The board did not distinguish between them. It cannot be said that the non-union employes and the members of the unions which had not formally voted to strike were in President Judge KELLER's phrase in *Miller v. Unemployment Compensation Board of Review,* 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740, "innocent bystanders." If not all were deterred by the union tradition against crossing a picket line, they at least shared the strikers' viewpoint and, in the language of the *Miller* case, supra, p. 321, "act[ed] in concert to prevent a continuance of operations." Or as the board put it: "In short, the employes generally made the suspension by the tool and die makers their own voluntary suspension of work." The evidence substantially sustains that conclusion, and there is no basis in the record for distinguishing between the variant classes of appellants.

The board moved to quash this appeal upon the ground that persons who have separate interests in the case may not prosecute a joint appeal. Cf. *Schuetz's Est.,* 315 Pa. 105, 172 A. 865. Technically the board is correct, for although the unemployment may arise out of the same suspension of or separation from work each claimant is required to file a separate claim for benefits, and each claim is the basis for separate action by the bureau, the referee and the board. However, the board indicated its willingness to waive its objection, and we have accordingly decided the case upon its merits. We have also taken into account the fact that some agreement had been reached between the agents of the bureau and the employes whereby only a small number of representative claims were filed in order to reduce the paper work of the bureau and yet provide a sufficient basis for the adjudication of all phases of the controversy. We recognize that the board is a separate appellate agency and is not bound by agreements made by the bureau, and yet,

in the interest of expedient justice, we venture to suggest that some modus operandi might be evolved, either by a rule of the board or by a joint rule of the board and the bureau, whereby representative cases could be presented to the board and this court, and decision upon them rule all other claims. Perhaps action by the legislature is required, but certainly each of 24 claimants should not in this class of litigation be required to incur the expense of prosecuting a separate appeal. And when, as in this instance, save for the wise action of the bureau, almost 4000 appeals might have become necessary, the call for some action by some one in authority becomes all the more potent.

Decision affirmed.