McGinnis Unemployment Compensation Case.
Kendall Refining Company *v.* Unemployment
Compensation Board of Review.

Argued April 9, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*John G. Wayman,* with him *Leonard L. Scheinholtz,* and *Reed, Smith, Shaw & McClay,* for employer, appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*M. H. Goldstein,* for claimants, intervenors.

OPINION BY WRIGHT, J., June 11, 1957:

This is a test case to determine the eligibility for unemployment compensation benefits of over two hundred employes of the Kendall Refining Company of Bradford, Pennsylvania, hereinafter referred to as Kendall. The claims cover the period between February 6, 1954 and April 22, 1954. The Bureau allowed benefits on the ground that claimants were unemployed as the result of curtailment of work by the employer. The Referee reversed the Bureau and disallowed benefits on the ground that claimants were disqualified under Section 402(d) of the Unemployment Compensation Law.[1] The Board of Review, after taking additional testimony, vacated the Referee's findings of fact, substituted its own, reversed the Referee, and allowed benefits. The employer has appealed.

The claimants herein involved are members of Local 567, Oil Workers International Union CIO. They were employed either as production or maintenance personnel for Kendall under a collective bargaining agreement which was due to expire at midnight on February 7, 1954. About sixty days prior thereto, Kendall and the union began negotiations concerning a new agreement, and a number of conferences were held. At the conference of February 3, 1954, Kendall was informed that a vote had been taken authorizing the calling of a strike. However, no date was designated. The position of the union was that Kendall should continue

---

[1] Act of December 5, 1936, P. L. [1937] 2897, Section 402(d), 43 P.S. 802(d).

operating the plant under the existing terms and conditions of employment pending further negotiations. On February 4, 1954, another conference was held, at which time Kendall submitted a written proposal for an orderly shutdown in the event of a strike. This proposal was not satisfactory to the union, and a counter written proposal submitted by the union was not satisfactory to Kendall. On February 8, 1954, the employes reported to the plant for work. They were informed that the plant had been shut down, and that little or no work would be available. When cold weather abated, Kendall made ready to start up its producing units whereupon, on April 22, 1954, the union officially called a strike.[2]

It is conceded by both sides that a labor dispute existed, and that a stoppage of work ensued. The controverted issue is the question of responsibility for the resulting unemployment. Kendall's position is that it had reason to believe that a strike would occur, and that, in the absence of written assurance of an orderly shutdown, it was justified in taking steps to protect its plant while still in control of the labor situation. On the other hand, it is the contention of the union that Kendall discontinued operations in order to gain an advantage in collective bargaining. Its position is that a strike had actually not been called, that the employes were ready and willing to work beyond the expiration date of the contract under existing terms and conditions, and that they had given verbal assurance of an orderly shutdown in the event of a strike.

The credibility of witnesses, the weight of their testimony, and the reasonable inferences to be drawn

---

[2] The only unit in operation at that time was the phenol plant. There was testimony that the union offered to shut it down in a safe and orderly manner, and to permit employes to work beyond the strike deadline for that purpose.

therefrom are for the Board. It is our duty to view the evidence in the light most favorable to the party in whose favor the Board has found, giving that party the benefit of every inference which can be logically and reasonably drawn from it. See *Elnit Unemployment Compensation Case,* 168 Pa. Superior Ct. 158, 77 A. 2d 668; *Bako Unemployment Compensation Case,* 171 Pa. Superior Ct. 222, 90 A. 2d 309; *Hanna Unemployment Compensation Case,* 172 Pa. Superior Ct. 417, 94 A. 2d 178; *Weimer Unemployment Compensation Case,* 176 Pa. Superior Ct. 348, 107 A. 2d 607. Findings of fact by the Board which are supported by competent and substantial evidence are conclusive, and binding upon the appellate court: *Allen Unemployment Compensation Case,* 174 Pa. Superior Ct. 514, 102 A. 2d 195. In the case at bar, the Board made, inter alia, the following findings of fact:

"3. During the month of November, 1953, the employer kept the crude unit in operation, although it was scheduled for shutdown during the weeks of November 15 and November 22. During the months of December, 1953, and January, 1954, the employer stepped up production by adding extra workers and extra shifts, and also hired extra warehouses in which to store packaged goods.

"5. During the month of January, 1954, several employes dismantled an unusually large number of pumps in the dewaxing and derinsing units. During the first week in February, refrigerators, stoves and cots were brought into the plant. All of this work was done under a job order charged to emergency preparation.

"7. The union committee did not signify their intention to call a strike, nor did they fix any time at which a strike might be called.

"10. The union committee had given their verbal assurance that there would be a safe and orderly shutdown. The employer, however, insisted upon a written guarantee and had submitted a memorandum as to its version of shutdown procedure.

"11. The employer had shut down the Dubbs unit in January, 1954. The employer began to shut down the other units at various times on February 3, 4, and 5, 1954, and the shutdown was completed on February 6, 1954.

"12. On February 4, 1954, and again on February 6, 1954, the union committee requested the employer to continue operating under existing terms and conditions of employment, but the employer refused these requests".

Kendall first argues that the findings of the Board "do not support the legal conclusion that this was a 'lockout' ". Strikes and lockouts are economic weapons. A lockout is an employer's withholding of work from his employes in order to gain a concession from them. It is the employer's counterpart of a strike. It may be present in varying factual situations, and no definition can comprehend all its manifestations. The core of a lockout is the act of an employer in withholding work. See *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 83 A. 2d 386. It is argued that the instant situation "falls into the general category of cases in which an employer curtails his operations in anticipation of a strike". Reliance is placed upon *Lavely Unemployment Compensation Case,* 166 Pa. Superior Ct. 481, 72 A. 2d 300. In that case, however, formal notice was given that a strike would be called. Several days before the date set, the company was again notified that the men would quit work on the day fixed for the strike. The company commenced curtailing its operations and shut down the

unit where claimant was employed. The following language of Judge RENO is significant: "Of course, an employer may not use a strike notice as a mere pretext for closing his plant and discharging his employes. He cannot secure a bargaining advantage by such means. Borrowing counsel's penetrating phrase, 'he cannot jump the gun on his employes' ".

It is stated in Kendall's brief that, "If an official notice that a strike will occur at a specified time is an absolute inflexible prerequisite to curtailment of operations to protect property in anticipation of a strike, then the Board's decision in this case should be affirmed". However, it is unnecessary to establish such a hard and fast rule in order to decide the present case. Kendall's contention "that a strike could occur on February 7 at midnight was in this particular case sufficient", conflicts with the finding of the Board that the union did not signify an intention to call a strike nor fix any time at which a strike might be called. Moreover, it disregards the finding that the union requested Kendall to continue operating the plant under existing terms and conditions of employment, and verbally agreed to accomplish an orderly shutdown if a strike was actually called. In *Leto Unemployment Compensation Case,* 176 Pa. Superior Ct. 9, 106 A. 2d 652, after reviewing a number of the decisions of this Court relative to work stoppages, Judge Ross said that the cases "establish the principle that where a claim is made for benefits and it appears that a labor dispute led to a work stoppage, it is the duty *of the compensation authorities* to ascertain the 'final cause' of and 'responsibility' or 'fault' for such work stoppage" (italics supplied). In other words, the controlling question of fact is to be determined by the Board, and we are not at liberty to set aside its finding in such regard when it is supported by the evidence.

Kendall next argues that it "had reasonable grounds for believing that a strike might occur". This argument is based upon the fact that the contract was due to expire on February 7, and that a strike might thereafter be called at any time. We must again note, however, the finding of the Board that the union had not signified an intention to call a strike, and had not fixed any time at which a strike might be called. This finding is supported by testimony that the purpose of the strike vote was merely to give the committee a vote of confidence, and that another vote of the membership would have been necessary to actually call a strike.[3] The record further shows that, while strike votes were generally taken in past years during contract negotiations, the union had never before actually called a strike. We also note the Board's finding that the union requested Kendall to continue to operate the plant. Under these circumstances the Board felt justified in drawing the inferences (a) that a strike did not appear to be imminent, and (b) that, if a strike was called, there would be an orderly shutdown. On these questions we cannot, even if we would, substitute our judgment for that of the Board: *Urback Unemployment Compensation Case*, 169 Pa. Superior Ct. 569, 83 A. 2d 392.

Kendall next argues that the "measures taken to protect the plant were reasonable under all the circumstances". This argument assumes that it was necessary to shut down the plant, a premise with which, as already indicated, the Board did not agree. Kendall

---

[3] That Kendall was aware of this fact appears from the following statement by its Vice President, Howard V. Smith, in his talk to the employes on February 8, 1954: "The plant is down, and, under the circumstances, we don't feel safe to go ahead and try to start it up while you fellows haven't made up your minds what you want to do in regard to a strike".

insisted upon written assurance that, in the event of a strike, there would be an orderly shutdown. Considerable portions of the briefs concern the counter proposals in this regard. The Board concluded that, under all of the circumstances, Kendall's insistence upon a written assurance was not justified. We quote from the opinion of the Board as follows: "More specifically, the employer contends that it was forced to shut its plant down because the union would not give it assurance of a safe and orderly shutdown procedure. The union, however, did give such assurance verbally, pointing out that this was required by law. The employer's position is not a tenable one. The written memorandum submitted by the employer concerned itself solely with the conduct of the parties after a strike was in progress. The union countered with a written proposal covering the same subject matter, which proposal contained a written guarantee for a safe and orderly shutdown. These proposals were admittedly matters for bargaining which the parties were unable to resolve. It is not within the province of the Board to make a determination upon the reasonableness of the proposals made by the parties to labor-management negotiations".

Kendall next argues that the "Board's finding with respect to the union's request that the employer continue operating under existing terms and conditions is contrary to the evidence and irrelevant". On the contrary, the Board's finding in this regard (No. 12) is supported by competent evidence. Francis J. Prorok, international representative for the Oil Workers International Union, testified: "We repeatedly asked . . . to keep the refinery running while we continued to negotiate". Similar testimony was given by Virgil O. Poling, president of the local union. It is argued that the plant did not actually shut down on February

8, and that the union members continued to work thereafter under exactly the same wages and other conditions of employment that were in effect prior thereto. Howard V. Smith, Kendall's vice-president, testified: "I want to make it clear that we did not shut the plant or close the plant. We merely shut down processing units which would be endangered by a disorderly shutdown. The plant remained open, and we continued to ship products". However, claimants were thereby either wholly or partially unemployed. Kendall had stock-piled sufficient finished products to permit continued shipments to its distributors, and had thus achieved "maximum bargaining strength". The conclusion of the Board was that the refusal of Kendall to maintain the status quo for even a short period of time precipitated the work stoppage and was the final cause thereof: *Leto Unemployment Compensation Case*, supra, 176 Pa. Superior Ct. 9, 106 A. 2d 652. Certainly this conclusion was relevant to the final decision.

Kendall's concluding argument is that the "final responsibility for the unemployment was the union's". Concededly the controlling fact to be determined was the ultimate responsibility for the unemployment. As stated in *Hogan Unemployment Compensation Case*, supra, 169 Pa. Superior Ct. 554, 83 A. 2d 386: "The negotiations are relevant to show . . . the attitude of the parties, but the ultimate and crucial question is: *What* occurred *after* . . . and *who caused* the work stoppage". The responsibility, or fault, for a work stoppage is assessed against the party whose actions constitute the final cause thereof: *Morris Unemployment Compensation Case*, 169 Pa. Superior Ct. 564, 83 A. 2d 394. There can be no question in the instant case that the stoppage of work resulted from the affirmative action of Kendall in closing down its processing units. Having carefully reviewed this record, we cannot say

that there was no basis for the Board's ultimate conclusion that "the shutdown of the plant was the final step in the plan of the employer to strengthen its bargaining position . . . Therefore, we hold that the final responsibility for the work stoppage rests upon the employer, and that the work stoppage is the result of a lockout as defined in Section 402(d) of the Law".

Decision affirmed.

HIRT, GUNTHER and ERVIN, JJ., dissent.