## Litman *v.* Litman, Appellant.

Argued October 9, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Henry T. Reath,* with him *John M. Ross* and *Duane, Morris & Heckscher,* for appellant.

*David L. Ullman,* with him *Allen J. Levin,* for appellee.

OPINION BY GUNTHER, J., January 21, 1958:

This is a workmen's compensation case. Claimant was a manager and bartender in defendant's taproom where he worked regularly without losing any time. On February 27, 1950, in the absence of a porter, claimant went to the refrigerator to tap a keg of beer, which ordinarily takes five to ten minutes to perform. While tapping the beer a rod broke and claimant, in attempting to repair the broken rod and then installing a new one, remained in the refrigerator for thirty minutes in an apron and shirt sleeves. This was the first time in fourteen years that this had ever happened.

The next day claimant felt a cold in his chest. He suffered from an acute infection causing him to cough and spit up yellow sputum. Two weeks after the incident, he was taken to the hospital, paralyzed, where he remained from March 14th until August 16th. On August 18th he was sent to the Bellevue Medical Center of New York University in New York City where he remained until a short time before Christmas. He has been at home ever since, paralyzed and with a constant attendant. He is totally disabled from the chest cage down, suffering from transverse myelitis.

The referee, who had heard the case, found, as a fact, that on February 27, 1950, while in the course of his employment, the claimant was attempting to tap a keg in the refrigerator where he found a defective rod, and while removing this rod and inserting a new one, he was required to spend one-half hour in the refrigerator where the temperature was 40 degrees Fahrenheit. He further found that this exposure was the cause of the infection and that the infection resulted in transverse myelitis rendering claimant totally disabled.

The award of the referee was affirmed by the board and the appeal to the Court of Common Pleas of Philadelphia County was dismissed. From the action of the court below, this appeal was taken.

Defendant here urges that there was no competent medical testimony to support the finding of fact of the compensation authorities to the effect that a causal relationship existed between claimant's transverse myelitis and his exposure to 40 degree temperature, and that the facts as found by the referee did not constitute an accident. The other issue, that no personal injury was sustained by claimant, was not raised before the board and will not now be considered for the first time on appeal.

The board is the ultimate arbiter of the facts and its findings are binding on appeal if supported by competent and substantial evidence. *Greap v. Oberdorff,* 178 Pa. Superior Ct. 153, 157, 113 A. 2d 339; *Messikomer v. Baldwin Locomotive Works,* 178 Pa. Superior Ct. 537, 543, 115 A. 2d 853; *Allen Unemployment Compensation Case,* 174 Pa. Superior Ct. 514, 102 A. 2d 195. Did the referee and the board, as fact finding bodies, base their findings on competent medical testimony when they believed that the disease was due to a respiratory infection, having first eliminated other sources of the disease? It is our duty to view the evidence in the light most favorable to the party in whose favor the board has found, giving that party the benefit of every inference which can be logically and reasonably drawn from it. *Weimer Unemployment Compensation Case,* 176 Pa. Superior Ct. 348, 107 A. 2d 607; *McGinnis Unemployment Compensation Case,* 184 Pa. Superior Ct. 95, 132 A. 2d 749.

The following medical and other testimony was presented to support the claim: (a) Dr. Herbert J. Darmstadter testified that in his opinion the exposure caused

the upper respiratory infection and the upper respiratory infection caused the myelitis. On cross-examination he was asked:

"Q. Then, Doctor, would you summarize for us your best opinion as to the chain of events which lead from the exposure to the transverse myelitis and the paralysis from which this man still suffers? A. Exposure to cold; upper respiratory infection extending to the lower respiratory region; infection involving the spinal cord in such a way as to produce transverse myelitis to produce the paralysis described. Q. Is that your best professional opinion? A. Yes." In confirming his opinion as to causal connection, the doctor considered the suddenness of the onset as significant. The hospital reports eliminated chronic diseases, a spinal block or cord tumor. (b) Claimant's history was taken upon his admission to the hospital on March 14, 1950. Special tests as well as routine laboratory tests were all negative. Dr. Gammon testified that high temperature and a high blood count indicated an infection of the upper respiratory tract. (c) Claimant's wife testified that her husband had cold symptoms for approximately two weeks before he was taken to the hospital. She stated that he had coughing spells and temperature above normal. (d) Isadore Weiss, a fellow employe, stated that the onset of claimant's cold was about two weeks before he went to the hospital. (e) Mrs. Frances Smolin, a neighbor, testified that on the Tuesday evening before claimant went to the hospital, he appeared to have a bad cold which was particularly noticeable because for years he was in good health.

Defendant called several doctors. Dr. Stein testified that he had no recollection of the case except what was indicated upon his records which was as follows:

"3/13/1950, temperature 102 Fahrenheit, Headache, a backache. Injection of 300,000 units of penicillin

on 14th of March about 2:00 A.M. Fever 102 degrees Fahrenheit. Could not walk. Crawled to the bathroom. Cord, spinal involvement. Admitted to U. of P."

Dr. George B. Gammon testified that several histories were obtained by three different doctors. The history as found on the hospital chart showed the following:

"The patient was well until March 17th—March 7, 1950, when he noted the onset of a cold which persisted for a week. On 3-13-50 he awoke with a sharp continuous pain—with sharp continuous pains over his scapulae which persisted until 5:30 P.M. after sedation and analgesic medication by his LMD, local medical doctor. On getting out of bed about 9 P.M. his legs were very weak and buckled under him. At 3 A.M. the following day he noted complete paralysis of his legs, and retention of urine with inability to void. His local Medical Doctor told him he was febrile all along." Another history was taken by Dr. Dillon. In answer to the question of causal connection between the head cold and the myelitis, the doctor replied:

"I have decided that on the basis of probabilities it is extremely unlikely that these two events were associated. I am not, however, denying a possibility."

Dr. Philip E. Duffy could not remember the answers that the claimant gave him regarding the date of the onset of his cold symptoms. In rebuttal claimant produced evidence, which supports his contention, that he experienced a cold the next day after the rod breaking incident. There appears a definite discrepancy between claimant's testimony and the hospital records which purport to recite facts which took place prior to claimant's admission to the hospital.

Defendant cites *Lacey v. Washburn & Williams Co.,* 309 Pa. 574, 164 A. 724, as authority for her position, namely that to constitute an accident there must be

some untoward occurrence aside from the usual course of events. In that case, the Supreme Court disallowed compensation holding that the death of the decedent due to a chill while working for an hour in a refrigerator where the temperature was 10 to 20 degrees below zero was not the consequence of a sudden and unexpected event which took place without expectation, a mere chance or contingency.

Is the case before us distinguishable from the facts and circumstances in the *Lacey* case? In the instant case, we are faced with an untoward occurrence and an unforeseeable mishap. The sudden breaking of the rod, which created an unusual condition, was an unforeseen and untoward happening—something out of the ordinary—which was not to be reasonably anticipated in the course of this claimant's regular work. This is what set in motion the events which resulted in transverse myelitis. The emergency necessitated the unprecedented exposure. *Dumbluskey v. Philadelphia & Reading Coal & Iron Co.,* 270 Pa. 22, 112 A. 745.

If the board concluded, as it did here from the testimony, that the transverse myelitis was a direct result of the exposure we have no right to reverse the board. Obviously there appears a contradiction between the testimony and the hospital records but this conflict is for the compensation authorities to resolve. A review of the testimony leads us to agree with the board that the onset of the cold occurred soon after the exposure and not a week before the claimant's admission to the hospital as contended by defendant. Dr. Darmstadter maintained throughout his testimony that this kind of respiratory infection could cause myelitis.

In *Evans v. Hazle Brook Coal Co.,* 134 Pa. Superior Ct. 462, 4 A. 2d 197, we held that there was evidence to sustain a finding of undue exposure, that the

undue exposure was a contributory factor and that death was the result of an accident. In *Heisler v. Lincoln Realty Company,* 121 Pa. Superior Ct. 516, 184 A. 305, we held that the causal connection between the death of the decedent from pneumonia was sufficient to sustain a finding that such resulted from an accident in the course of his employment. Here the findings of the compensation authorities established an accident on February 27, 1950. This was the basic issue.

The compensation authorities considered the testimony of both parties and made the award in favor of the claimant. The connection between the accident and the injury was established by competent evidence and we are not inclined to disturb the award.

Order affirmed.