Hutchins Unemployment Compensation Case.
Lewis et al., Appellants, *v.* Unemployment
Compensation Board of Review.

Argued March 10, 1958. Before RHODES, P. J., WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (HIRT and GUNTHER, JJ., absent).

*James K. Peck,* for appellants.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for appellee.

OPINION BY ERVIN, J., September 11, 1958:

Thirty-two claimants were allowed unemployment compensation by the bureau, the referee and the board of review. The employer appealed.

So far as is here pertinent, §402(d) of the Unemployment Compensation Law, as amended by the Act of May 23, 1949, P. L. 1738, §11, 43 P.S. §802, provides: "An employe shall be ineligible for compensation for any week— . . . (d) In which his unemployment is due to a stoppage of work, which exists *because* of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed. . . ." (Emphasis added)

The claimants herein involved are members of a union. The employer is a building block manufacturer. A written agreement, entered into by the union and the employer, became effective on June 20, 1955 and was to remain in force until April 30, 1956 "and remain in effect thereafter from year to year unless sixty days notice of change is given by either party of the desire to change, alter, or terminate the terms of this Agreement."

On February 28, 1956 the employer received a letter from the union in which it said: ". . . we are hereby giving you notice of our desire to terminate our present collective bargaining agreement, which by its terms will conclude and terminate on the 30th day of April, A.D. 1956. We desire to arrange a mutually convenient appointment for the purpose of commencing negotiations for a new collective bargaining agreement." The parties held negotiation meetings on April 10, 27, May 3, 8, 15 and July 11, 1956. They also held a number of additional meetings after July 11, 1956. The claimants continued working from April 30 until July 11, 1956, by mutual agreement, under the same terms and conditions as contained in the expired agreement. During the negotiations both sides were endeavoring to secure more favorable terms but had not been able to reach an agreement. The referee found and the board approved, inter alia, the following findings of fact: "11. At the close of the negotiation meeting on July 11, 1956, the employes again asked to be allowed to continue working under the same terms and conditions as contained in the expired contract and in fact requested the employer to sign such an agreement. The employer refused the request of the Union.

"12. After July 11, 1956, the employes could continue working only under the terms and conditions as proposed by the employer in Finding of Fact No. 9 above; hence, a work stoppage occurred beginning at 7:30 a.m. July 12, 1956."

We have carefully reviewed the record and can find no competent and substantial evidence to support these two findings. On the contrary, the evidence is quite clear that the claimants had worked for nearly two and one-half months after the termination of the written contract under the same terms and conditions as those contained in the written contract. What really hap-

pened was that the union tendered a written contract to the employer and requested him to sign it. He refused because no other block manufacturer in his territory had been unionized. The union over a year before had promised him that it would endeavor to sign up his competitors but frankly admitted that it had been unable to do so. The employer was paying higher wages and giving more fringe benefits than any of his competitors. On July 11, 1956 the union took the position "no contract, no work" and called a strike to commence July 12, 1956, on which date it posted a picket line and the men carried signs bearing the following language: "Strike, Scranton Block Company, unfair to labor, Local 158, AFL-CIO, Refuses to Settle a Grievance." Not only had the claimants worked from April 30, 1956 to July 11, 1956 under the same terms and conditions as those in the terminated written contract but the evidence is clear that they could have continued to do so had they reported for work on July 12, 1956 instead of striking and establishing a picket line. On July 11, 1956, after the union notified the employer that a strike had been called for the next day, the employer posted a sign on a board over the time clock which read:

"July 11, 1956

NOTICE

NOTICE IS HEREBY GIVEN BY SCRANTON BUILDING BLOCK COMPANY THAT THERE IS AND WILL BE WORK FOR ANY OR ALL REGULAR EMPLOYEES DURING THE REGULARLY SCHEDULED HOURS.

WORK IS AVAILABLE.

RESPECTFULLY
SCRANTON BUILDING BLOCK
COMPANY
John J. Gordon
John J. Gordon"

The plant remained open. Some college students who were on vacation were temporarily hired and operation continued. Not one of the claimants sought reemployment although the employer requested them to return to work. They could have continued to work at the same wages and with the same fringe benefits as they had received under the written contract. The only omission would have been a written contract with a "closed shop" clause. While the claimants under the law are not obliged to work without a written contract neither may they call upon the unemployment compensation fund to finance this luxury. This subject has been well and thoroughly disposed of by Judge RENO in *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 563, 564, 83 A. 2d 386, as follows: "On the other hand, the Union had proclaimed: 'no contract, no work', and the claimant and his fellow members, for that reason, did not report for work. In the absence of a contract the union members were justified in refusing to work, but the refusal was nonetheless a strike. Our Pennsylvania legislation and decisions have not dealt with that question, but the Taft-Hartley Act specifically provides: 'The term "strike" includes any strike or other concerted stoppage of work by employees (*including a stoppage by reason of the expiration of a collective-bargaining agreement*) and any concerted slow-down or other concerted interruption of operations by employees': Act of June 23, 1947, Title V, §501, 61 Stat. 161, 29 U.S.C.A., §142. (Emphasis added.) We are not bound by Congressional legislation, but the principle is sound and applicable, and therefore we adopt it, and hold that a concerted cessation of work after the expiration of a collective bargaining agreement, in the absence of other and qualifying circumstances, is a strike. Certainly it is a strike where the Union expressly avows and acts upon

the principle of 'no contract, no work'. The Board properly concluded that the *final cause* of the work stoppage was the refusal of the union members to work without a contract. The resultant cessation of work constituted a strike and disqualified the employes for benefits."

It should be pointed out that these claimants would have continued to work for another year under the written agreement had their union not elected to terminate the written contract at the end of the first year. It was their action which forged the first link in the chain of events which ultimately led to the unemployment of the claimants. The definitions of "strike" and "lock-out" have also been so well covered in the *Hogan* case that we deem it unnecessary to repeat them in this opinion. There was no withholding of work by the employer in this case and the cessation could not be designated a lock-out. It was exactly what the claimants themselves proclaimed it to be on the picket line banners—a strike.

*McGinnis Unemployment Compensation Case (Kendall Refining Co. v. U. C. Board of Review)*, 184 Pa. Superior Ct. 95, 132 A. 2d 749, is easily distinguishable from the present case. In the *Kendall* case the collective bargaining agreement was due to expire at midnight on February 7, 1954. About 60 days prior thereto, negotiations concerning a new contract commenced and a number of conferences were thereafter held. On February 3, 1954 Kendall was informed that a vote had been taken authorizing the calling of a strike. However, no date was designated. On February 8, 1954, one day after the expiration of the contract, the employes reported to the plant for work. They were informed that the plant had been shut down and that little or no work would be available. In the *Kendall* case the evidence is clear that the employes reported

for work but could not work because the employer had closed the plant. In the present case, the plant was not closed by the employer at the time when the original contract expired on April 30, 1956 or at any time thereafter. It is undisputed that the employes continued to work from April 30, 1956 to July 11, 1956 under the same terms and conditions as those contained in the expired written contract. At all times the employer continued the operation of the plant and gave notice to the employes that work was available. The employes did not report for work as they did in the *Kendall* case. In the *Leto Unemployment Compensation Case,* 176 Pa. Superior Ct. 9, 106 A. 2d 652, it was the employer who elected to terminate the agreement. The employer also wanted to reduce the wages $12\frac{1}{2}$ cents an hour and to increase the work loads. The union offered to continue working on the basis of the existing agreement for a year, a month or even 15 days to allow additional time for negotiation. The employer refused this offer and informed the union that work would be available on the first day following the expiration of the contract at the reduced wage rate proposed by it. The *Kendall* and *Leto* cases are clearly distinguishable from the present case.

We conclude this opinion with the following language of Judge Reno in the *Hogan* case, supra, at page 564: "The cause for the stoppage having been ascertained, it follows that claimant and his fellow members, who caused the stoppage, became unemployed through their own fault, within the meaning of the Law, §3, 43 P.S. §752, which is the lode star by which all provisions of the Law are construed. Michalsky Unemployment Compensation Case, 163 Pa. Superior Ct. 436, 62 A. 2d 113. Under that section and §402(d), supra, benefits were properly denied."

Decision reversed and judgment entered for the appellants.