# Westinghouse Electric Corporation *v.* Unemployment Compensation Board of Review (No. 4). Gray Unemployment Compensation Case.

Argued June 13, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

reargument refused October 9, 1958.

*John G. Wayman,* with him *Elder W. Marshall,*

*Leonard L. Scheinholtz, James H. Hardie,* and *Reed, Smith, Shaw & McClay,* for appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*David Cohen,* for appellees-intervenors.

OPINION BY RHODES, P. J., September 11, 1958:

The Westinghouse Electric Corporation appeals from a decision of the Unemployment Compensation Board of Review granting compensation to employes who ceased working at the expiration of a collective bargaining agreement. The board was of the opinion that Westinghouse was responsible for the work stoppage and allowed compensation on the basis that the unemployment was due to a lockout.[1] The facts as found by the board do not support its conclusion. The decision will be reversed.

The claimants are employes of the Westinghouse Electric Corporation at its plant known as the South Philadelphia Works, Steam Division, Tinicum Township, Delaware County (Lester Plant). They are members of Local 107 of the United Electrical, Radio and Machine Workers of America (UE), which is the bargaining unit for approximately five thousand production and maintenance workers and approximately one thousand office and clerical workers employed at the South Philadelphia Works. The collective bargaining agreement in effect between the company and the union consisted of a national agreement negotiated on a company wide basis as well as a local sup-

---

[1] The Bureau of Employment Security denied benefits for the period from October 14, 1955, to December 27, 1955; benefits were allowed from December 27, 1955. The referee held that the work stoppage was a lockout from its inception.

plement negotiated by the company and Local 107. The national agreement provided for the termination of the local supplement at midnight October 14, 1955, upon sixty days' written notice by either party. In the event that neither party gave sixty days' written notice the local supplement would continue in effect until October 14, 1956. By letter dated August 12, 1955, the company notified Local 107 of its intention to terminate the local supplement effective October 14, 1955. The letter further stated that any other agreements or understandings between Local 107 and local management at any level were terminated as of October 14, 1955. On August 29, 1955, the company and the local began negotiations which continued until October 14, 1955. In the course of the negotiations the company submitted proposals to revise the working conditions in the new contract. Local 107 rejected the company's proposals and proposed that the existing terms and conditions of employment be maintained. On October 12, 1955, two days prior to the termination of the contract, the union proposed that the existing local supplement be extended for ninety days while negotiations continued. This proposal was rejected by the employer. On October 13, 1955, Local 107 announced the results of a strike vote which showed that the employes authorized a strike. When the company inquired concerning the significance of the strike vote, the union representative replied that as long as conditions in the plant remained the same negotiations would continue. On October 14, 1955, Local 107 requested that negotiations be continued over that week-end or be fixed for some time during the following week. The company rejected this request. Local 107 then requested the company to give assurance that existing terms and conditions of employment would continue beyond October 14, 1955, while the parties negotiated. The company

refused to give such assurance because it felt that it could unilaterally change the terms and conditions of employment if it desired. However, the board found: ". . . the employer stated it would not change existing conditions until it notified the local and discussed the changes. The employer further stated that if notice and discussion took place it reserved the right to make the changes desired." The local supplement expired as of midnight October 14, 1955, and the claimants did not return to work on Monday, October 17, 1955, the next scheduled working day. The work stoppage continued in effect until August 8, 1956, at which time the parties concluded a collective bargaining agreement.

The board concluded that the final cause and responsibility or fault for the work stoppage rested upon the company. The board was of the opinion that the facts in this case were substantially the same as those in *Leto Unemployment Compensation Case,* 176 Pa. Superior Ct. 9, 106 A. 2d 652, which held that the refusal of the employer to maintain the existing terms and conditions of employment at the expiration of a collective bargaining agreement for a reasonable time pending negotiation of the new collective bargaining agreement amounted to a lockout. In the *Leto* case a collective bargaining agreement was expiring and the parties were negotiating a new contract. The employer had proposed a wage reduction which proposal the union rejected. On the day before the expiration of the contract the parties met and the company insisted upon the wage reduction. The union representatives would not agree to this proposal; instead they offered to continue working on the basis of the existing agreement for a year, a month, or even fifteen days to allow additional time for negotiation. The employer refused this offer and informed the union that work would be

available on the first working day following the expiration of the contract at the reduced wage rates proposed by the company. The employes refused to return to work on the employer's conditions. The board allowed compensation; on appeal we affirmed stating: ". . . the employes . . . are entitled to benefits *not* because the company offered terms less advantageous than those contained in a prior contract, but rather because the company refused to furnish work on the basis of the pre-existing terms and conditions of employment for a reasonable time to avert a work stoppage pending settlement of the labor dispute." *Leto Unemployment Compensation Case,* supra, 176 Pa. Superior Ct. 9, 15, 106 A. 2d 652, 654. The *Leto* case is far different from the present one. In the *Leto* case the employer stated definitely that, on the first work day following the expiration of the contract, work would be available only under the changed terms and conditions. In the present case, although the company would not give "assurances" concerning the extent to which the existing terms and conditions of employment would be continued beyond the expiration of the contract, the company did definitely state that it would not change the existing terms and conditions until it notified the local and discussed the changes, reserving the right to make the revisions desired notwithstanding the outcome of such notice and discussion. Here work was available to the employes on the first work day following the expiration of the contract upon the same terms and conditions of employment as under the old contract. In the *Leto* case the terms had definitely been changed. In fact, the present situation is closely analogous to that in the *McGinnis Unemployment Compensation Case,* 184 Pa. Superior Ct. 95, 132 A. 2d 749. In the *McGinnis* case the parties were negotiating a new contract to replace an expir-

ing contract. About four days before the old contract was due to expire the employer was informed that a vote had been taken authorizing the calling of a strike but that no date had been designated. A written proposal of the employer for an orderly shutdown of the plant in the event of a strike was refused by the union as not satisfactory, and a written counter proposal for an orderly shutdown submitted by the union was refused by the employer as not satisfactory. On the day following the expiration of the collective bargaining agreement, the employer closed the plant and informed the employes that the plant had been shut down and that little or no work would be available. We there affirmed the holding of the board that the work stoppage was due to a lockout because the employer closed the plant without reasonable grounds for believing that a strike would occur. The fact that the union had taken a strike vote did not afford a reasonable basis for anticipating the actual work stoppage in view of the circumstance that there was no definite time fixed for the strike to begin. In fact, the strike did not appear to be imminent, and the action of the employer in closing the plant under such circumstances was the final cause of the work stoppage. *McGinnis Unemployment Compensation Case,* supra, 184 Pa. Superior Ct. 95, 102, 132 A. 2d 749. The only difference between the *McGinnis* case and the present case is that the parties are reversed in a similar factual situation. Here the company stated that it could unilaterally change the terms and conditions of employment but it did state definitely that it would not change the existing terms and conditions of employment until it notified the local and discussed the changes. There was no basis for the employes to believe that on the day following the expiration of the contract work would not be available to them upon the pre-existing terms

and conditions of employment. When they went on strike because of the failure to receive "assurances" they did not act reasonably under the circumstances and their action was not consistent with a desire to remain employed. There was no ultimatum in this case by the company that the terms and conditions of employment would be changed on the day following the expiration of the contract; there were no changes whatever made and there was no deadline set for the making of any changes. That the company refused to formally extend the local supplement for ninety days while negotiations continued does not change the situation in so far as the Unemployment Compensation Law is concerned. The company was not obliged to formally extend the contract. The important consideration is that in fact the company indicated that it would maintain the existing terms and conditions of employment pending negotiation of the new contract; nevertheless the employes refused to continue working without assurances or a formal extension of the contract. Clearly the final cause and responsibility or fault for the work stoppage rests upon the employes.

After the strike began the company would not agree to meet with the union to negotiate until some time in January, 1956. Negotiations were resumed for several weeks when they were again broken off by the company to be resumed again in April, 1956. The board found as a fact that while the union was ready and willing at all times to conduct negotiation meetings the company was not. The significance of this finding is not clear from the decision of the board; it is not discussed in the body of the decision. Since the board saw fit to make a finding of fact upon this phase of the case, we deem it advisable to comment that such a matter could not properly be considered by the board. "Whether or not an employer fulfilled

his obligation to bargain collectively is not a question for the Board of Review. . . . That is to say, if an employer breaches the legal duty to bargain collectively, . . . the State's Unemployment Compensation Fund . . . is not liable for his dereliction." *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 562, 83 A. 2d 386, 391. See *National Labor Relations Board v. Wooster Division of Borg-Warner Corporation,* 356 U. S. 342, 78 S. Ct. 718, 2 L. Ed. 2d 823, It is to be noted that at the beginning of the work stoppage the employes engaged in mass picketing amounting to an illegal seizure of the plant. *Westinghouse Electric Corporation v. United Electrical, Radio and Machine Workers of America,* 383 Pa. 297, 118 A. 2d 180.

The decision of the board also contains an isolated finding to the effect that: "The claimants were ready and willing to go back to work at all times under the same terms and conditions of employment which existed prior to the expiration of the Local Supplement on October 14, 1955." This finding is meaningless and is inconsistent with the other findings of the board and with its ultimate determination. The decision of the board is not based upon the theory that the company refused to permit the employes to return to work after the initial strike. The decision of the board was based upon its belief that the company was at fault in refusing to extend the contract or to give "assurances" that the pre-existing terms and conditions would be maintained, even though the company did not undertake to make any changes amounting to a lockout and no such changes were imminent. The facts found by the board clearly establish that the employes were willing to remain at work only if the company extended the existing contract or gave the requested assurances. This could not by any applicable reasoning be

considered an unconditional offer to remain at work pending negotiations, or a reasonable attitude under the circumstances from the standpoint of the Unemployment Compensation Law.

The decision of the Board of Review is reversed.

---

DISSENTING OPINION BY GUNTHER, J.:

Under the facts of this case, I cannot agree with the majority opinion. I am of the opinion that the work stoppage, upon the expiration of the collective bargaining agreement, without continuing the same for a reasonable time pending negotiation of a new collective bargaining agreement amounted to a lockout and, therefore, the decision of the board should be affirmed.

The majority concedes that the letter of the company dated August 12, 1955, stated that any other agreements or understandings between Local 107 and local management at any level were terminated as of October 14, 1955. It is also conceded that in the course of negotiations with the company, prior to the expiration of the existing agreement, Local 107 proposed that the existing terms and conditions of employment be maintained, and that again on October 12, 1955, two days prior to the termination of the agreement, the union proposed that the existing local supplement be extended for ninety days while negotiations continued. This, too, was rejected by the company. On the last day the local supplement was to expire, October 14, 1955, the union requested that negotiations be continued over the week-end or be fixed for sometime during the following week and requested assurances from the company that the existing terms and conditions of employment be continued during ne-

gotiations. The company again refused to give such assurances.

In my view the *Leto Unemployment Compensation Case*, 176 Pa. Superior Ct. 9, 106 A. 2d 652, decided this exact situation and should control the disposition of this appeal. The majority distinguishes the *Leto* case from the instant case on the ground that the company, in the instant case, did state it would not change existing conditions until it notified the local and discussed the changes, and that *if notice and discussion took place,* it reserved the right to make the changes it desired. If such offer was made in good faith and if the existing terms and conditions were to be continued for a reasonable time, such distinction from the *Leto* case, supra, would be valid. But the testimony of the company clearly discloses the opposite intention (R. 188a-189a) :

"Q. In other words, what you are telling us is that as of midnight, October 14, the company reserved the right to determine wages, the terms and conditions of employment that were to exist and that the company said that it would make no changes until after notice and discussion, but that it did not obligate itself not to bring about any changes without prior agreement with the union, is that right?" and your answer is: A. That is right. Q. Was there anything said about how much notice would be given? A. I don't believe so. Q. And was there anything said about how much discussion there might be? A. Nothing, other than there would be reasonable discussion, discussion of reasonable duration. Q. Were you to determine and decide how long a discussion was a reasonable discussion? A. Yes, sir. Q. And the company would decide what is the time to bring about the changes? A. If it felt it necessary. Q. If it felt necessary, and there were no guarantees with respect to the time that the

436

existing conditions would remain in effect? A. No, sir. Q. They could change within one hour—and I am talking about could have, as far as your position was concerned? A. I don't believe so because I couldn't have made any statement and do that within an hour. Q. In one or two hours time of discussion, something you regarded as reasonable discussion? A. That is right."

Such a limitation could not under any circumstance be considered as a reasonable time pending negotiations of a new collective bargaining agreement. Under such restrictions, no employe could know at the outset of a working day what his wage rate and working conditions would be at the close of the day. Such limitation is tantamount to a complete rejection of the existing agreement pending negotiations. The conclusion is inescapable, therefore, that under the *Leto* case, supra, this amounted to a lockout.