Miller, Appellant, *v.* Unemployment Compensation Board of Review.

316

Argued March 9, 1943. Before KELLER, P. J., BALD-
RIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.
(RENO, J., absent).

*George A. Shutack,* for appellant.

*R. Carlyle Fee,* Assistant Special Deputy Attorney
General, with him *Charles R. Davis,* Special Deputy
Attorney General, and *James H. Duff,* Attorney Gen-
eral, for appellee.

OPINION BY KELLER, P. J., April 26, 1943:

This appeal is a test case involving about 1100 claims
for compensation under the Unemployment Compensa-
tion Act of December 5, 1936, (P. L. 1937, p. 2897), as
amended by Acts of May 18, 1937, P. L. 658, and
August 5, 1941, P. L. 845.

The point involved, as argued before us, is, Was the
unemployment waiting period of three weeks, which
had to elapse before unemployment compensation be-
came payable under the Act, lengthened to six weeks,
(section 401(e) ), by reason of the fact that claimant's
total unemployment, for which he claimed compensa-
tion, was "due to a voluntary suspension of work re-
sulting from an industrial dispute"? In other words,
the question involved is whether the circumstances ac-
companying claimant's unemployment amounted to a
voluntary suspension of work resulting from an in-

dustrial dispute, thus extending the 'waiting period' to six weeks? The Unemployment Compensation Board found that they did and refused compensation until after a six weeks' waiting period, within a year of fifty-two weeks, had elapsed. We are in accord with their finding and decision.

The relevant facts may be summarized as follows: Appellant and the other claimants in like case are employees of the Edison Anthracite Coal Company (hereinafter called the Company) at its Nesquehoning Colliery. They were members of Nesquehoning Local No. 1704 (hereinafter called Local) of District No. 7 (hereinafter called District) of the International Union of United Mine Workers of America (hereinafter called International and U.M.W.A.). The Company was a signatory to certain agreements between U.M.W.A. acting by the duly authorized officers of International and District (inter alia) of the first part, and certain Anthracite Operators, of the second part, dated May 7, 1936, May 26, 1939 and May 20, 1941, respectively.

The agreement of May 7, 1936 contained a clause or section, No. 6, providing for a 'check-off' or deduction by the operator of Union dues and International assessments out of its employees' wages, and payment of the same to the District Secretary-Treasurer. The section provided that the dues and assessments should be deducted by the operator upon receipt of a proper individual assignment from the employee; and, in paragraph two, that dues deducted should not exceed one dollar per man per month, and that assessments authorized and levied by International should not exceed $2 per man in any calendar year.

The agreement of May 26, 1939 contained *for the first time* a 'closed shop' provision, recognizing U.M.-W.A. as the exclusive bargaining agency of the employees of the signatory operators' mines, and agreeing

that as a condition of employment all employees[1] must be members of the U.M.W.A.

The agreement of May 20, 1941, inter alia, amended paragraph two of section 6 of the agreement of May 7, 1936, by adding the following provision, relative to the collection of dues, "When District Organizations require additional funds beyond those provided in said paragraph for their proper functioning, such additional funds may be collected in the manner herein provided when certified to the operators as acceptable to the District or Districts affected and the membership thereof and subject, moreover, to the approval of the International Executive Board of the United Mine Workers of America."

In conformity with the agreement of May 7, 1936, and pursuant to the individual 'assignments' of the employees, the Company, prior to July 1, 1941, deducted Union dues of one dollar per month from the earnings of the employees at the first semi-monthly pay day, and assessments of one dollar from each employee at the first pay days in January and February, and transmitted these amounts to the Secretary-Treasurer of District. The individual 'assignments' did not authorize the deduction of *any specific amounts* for Union dues and assessments, but simply referred to "the amounts applicable to Union dues [and] assessments ...... as provided in paragraph (6)" of the agreement of May 7, 1936, "which is printed on the reverse side hereof". As before stated, that section or paragraph only provided that they *should not exceed* one dollar per man per month *dues* and two dollars per man *assessment* in any calendar year. The amount payable was fixed, subject to that limitation, by the authorized officers and representatives of U.M.W.A. representing the Districts and Locals.

---

[1] With an exception not here material,

Following the execution of the agreement of May 20, 1941, but prior to July 1, 1941, it was determined at the District and International Convention or meeting of U.M.W.A. that the Union dues should be increased from $1 to $1.50 per month per member, effective as of July 1, 1941; and the International Executive Board of U.M.W.A. levied an assessment on all members of the Union of fifty cents per member per month, beginning August 1941; and following these actions, the officials of District No. 7 notified the Company of the same and certified that the said increases were acceptable to the District and the membership thereof and had been approved by the International Executive Board of U.M.-W.A., as provided in the amendment to paragraph 2 of section 6, contained in the agreement of May 20, 1941.

Following the receipt of this notice and certificate, the Company deducted, on the pay-day for the first half of July 1941, $1.50 Union dues from each employee's pay, and on the pay day for the first half of August, in addition to said $1.50 Union dues, deducted fifty cents International assessment from the earnings of each employee.

The members of Nesquehoning Local No. 1704 were generally not in favor of paying said increases in Union dues and assessments and objected to the company's deducting any sum in excess of the amounts mentioned in section 6 of the agreement of May 7, 1936, and also protested to the president of the Local, who as a delegate or representative had participated in the actions objected to.

Acting under the leadership of this appellant a petition signed by 980 employees of Nesquehoning Colliery was presented to the Company demanding that it refrain from making any further deductions at the increased rates.

On the other hand, the president of District notified

the Company's president that the Union would hold the Company responsible for making the increased deductions as directed; counsel for U.M.W.A. having notified the president of District that it was not necessary for the operators to secure new individual assignments from each member of the Union before the increased dues and assessments adopted at the convention could be checked off and deducted.

The Company thereupon notified the grievance committee of the employees that in the circumstances it could not comply with the request or demand of the majority of the employees at Nesquehoning Colliery and felt obliged to follow the directions of the officers of District.

On the morning of September 9, 1941, at the time when the men usually reported for work, claimant, Miller, who acted as a leader for the employees, addressed a group of 700 to 800 men, representing a majority of the employees at the colliery and advised that work be stopped unless the increases were rescinded, and asked them if they favored this action. They replied that they did. No objections were heard. At the conclusion of the meeting picket lines were formed and the rest went home. With the exception of maintenance men who, by agreement, worked on certain days during the suspension, no one attempted thereafter to go to work at the Nesquehoning Colliery until October 7, 1941, when following a meeting of Local, at which it was unanimously agreed that work should be resumed, the men returned to work.

The Unemployment Compensation Law (supra) does not define an 'industrial dispute'; nor are we called upon here to give the term an exact definition. It is enough to say that, in our opinion, the circumstances above recited show that an industrial dispute was here involved. Such a dispute does not have to be between employer and employees. It may be between the employees and their Union or bargaining agency, provided

it involves the employer and affects the terms or conditions of employment. The Company derived no personal gain out of this dispute, but like the "innocent bystander", it suffered more than the participants.

We are likewise of the opinion that the employees' suspension of work was 'voluntary' within the meaning of the Act. There were open to the employees forms of action or conduct by which the legality of the increased deductions could be determined without any stoppage of work. The Unemployment Compensation Law was not intended to promote stoppages of work by employees because of disputes with employers or bargaining agencies, which could be legally determined without any cessation of work. The fundamental idea of the Act is to provide a reserve fund to be used for the benefit of persons *unemployed through no fault of their own*. To call a suspension of work and act in concert to prevent a continuance of operations, without resorting to the legal measures open to determine the rights of the parties, amounts to a voluntary suspension of work, with the necessary consequences provided in the Act.

The findings of fact of the Board are supported by the evidence and under the Act are conclusive on us: Sec. 510; *Gallagher v. Unemployment Comp. Bd. of Review*, 148 Pa. Superior Ct. 228, 24 A. 2d 627; *Dept. of Labor & Industry v. Unemployment Comp. Bd. of Review*, 148 Pa. Superior Ct. 249, 24 A. 2d 924.

The conclusions and order of the Board are sustained by the findings.

The order is affirmed and the appeal is dismissed, at the costs of appellant.