Cassell Unemployment Compensation Case.

Argued March 22, 1950. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*M. H. Goldstein,* for appellant.

*William L. Hammond,* Special Deputy Attorney General, with him *Richard H. Wagner,* Associate Counsel and *T. McKeen Chidsey,* Attorney General, for appellee.

*Malcom B. Petrikin,* with him *Chadwick, Curran, Petrikin & Smithers,* for employer-intervenor.

OPINION BY HIRT, J., July 20, 1950:

On February 6, 1946, claimant, the appellant here, along with 186 other employes of Atlantic Steel Castings Company, in the City of Chester, went out on strike. They did not return to work until about March 18, 1946. The purpose of the strike was to force the employer to pay specific additional wage payments to the employes for the period between August 2, 1944 and November 18, 1945, or to arrange for payment on acceptable terms. On November 19, 1945, the employer acceded to all of the demands of the union as to the future and wages payable since that date are not involved in the present proceeding. The National War Labor Board had issued an order on October 19, 1945, directing that these additional wage payments be made. And it was the contention of appellant's union that the employer had contracted to pay the additional wages in amounts specified by the directive order of the War Labor Board. To the claims for unemployment compensation filed by these employes, both the Bureau and the Referee applied the disqualification period, of from four to five weeks, prescribed by §402(d) of the then applicable Act of May 29, 1945, P. L. 1145, amending the Unemployment Compensation Law. The Board of Review in a single opinion and order affirmed the decision of the Referee and disallowed all of the claims for the temporary disqualification period of §402(d) but without prejudice to their right to unemployment compensation thereafter. This is an appeal by one of the striking employes from the order of the Board. Appellant contends that his unemployment was not "due to a voluntary suspension of work" within the intent of the above section of the Act.

In the main there is no serious dispute as to the factual background of this appeal. The findings of the

Board reflect these salient facts: An existing collective bargaining agreement between the company and the union had expired on August 21, 1944. During the negotiations for a new contract for the following year there was agreement on many points. On the question of wages, the company and the union in October 1944 agreed that higher wage rate ranges should be established for each job classification in the plant, effective as of August 2, 1944. Under the existing national wage stabilization policy, this agreement on wage rates had to be submitted to the National War Labor Board for approval; this was done by the parties on November 22, 1944, in a document known as "Form 10". On January 26, 1945, the Regional War Labor Board, having jurisdiction of the subject matter, approved the new higher wage rate ranges. But attached to the Regional Board's ruling was a statement entitled: "Use of Salary or Wage Rate Ranges" which immediately raised a dispute between the union and the company as to what they had agreed upon and as to the meaning of the ruling of the War Labor Board as applied to the new wage rate ranges. After several conferences between the parties, without a settlement of the issues in dispute, the union called in a Commissioner of the U. S. Conciliation Service. Further meetings failed to result in agreement whereupon the union submitted the dispute to the National War Labor Board. On May 29, 1945, a panel of that Board handed down a majority decision. The opinion however did not purport to decide the issue as to what the parties had agreed upon as the basis for the submission on Form 10 to the National War Labor Board on November 22, 1944. On the contrary, the opinion recites in effect that the panel was unable to reach any conclusive determination as to whether any alleged agreement was made, but irrespective of any question of previous agreement the opinion recommended adjustments which would result in additional

increases effective August 2, 1944. On July 18, 1945, the Regional War Labor Board handed down a "Directive Order" to the effect in substance that the parties be governed by the recommendations of the panel and specifically directing retroactive payments. in accordance therewith, beginning with August 2, 1944. The company attempted to appeal from the decision; on October 19, 1945, the National War Labor Board refused the appeal and affirmed the previous directive of its Regional Board.

On October 22, 1945, upon settlement of a previous strike relating to the payment of a night shift differential in wages, not material in the present case, the settlement agreement provided "that all questions with respect to the retroactive pay on the wage ranges on Form 10 should be postponed until January 15, 1946, at which time the company would reconsider said matter with the union". In the meantime the company did not comply with the War Labor Board's directive, as to retroactive payments. Prior to January 15, 1946, the union insisted that the company commit itself to the full payment of these back wages as directed. The total amount involved was about $134,000. The company's then financial position was not good and in response to the union's demand, it, on February 2, 1946, proposed to settle the claims on the basis of 50% thereof "conditioned upon . . . the Company's ability to borrow such sum upon the security of its plant . . ." The union rejected the offer. On February 6, 1946, the company made its final proposal, that the discussion of settlement be postponed for an additional three months or, in the alternative, that the union accept the company's offer of February 2, 1946, on the basis of 50% of the back wages, with security for payment by assignment of the company's claim for a refund on Federal taxes theretofore paid by it, in the event the company should be unable to borrow the money involved. In refusing the

offer the employes suspended work to force the company to pay the claims in full as demanded. The suspension began on the night of February 6, 1946; a picket line was immediately established and subsequently maintained; foremen and other officials were denied admission to the plant. The suspension remained in effect until about March 6, 1946, when the company finally acknowledged the claims in their entirety and agreed to pay 75% thereof from "anticipated tax carry back benefits which the company expected to receive from the U. S. Treasury Department"; the remaining 25% to be paid in installments over a stated period. The men began returning to work on March 11, and by March 18, 1946, the plant was in full operation. The findings of the Board to the above effect are supported by substantial competent evidence and are binding upon us. Unemployment Compensation Law of December 5, 1936, Second Ex. Sess., P. L. (1937) 2897, Art. V, §510, 43 PS §830.

The effect of appellant's contention stated simply, is that the new collective bargaining agreement entered into in October 1944, contemplated, in the application of the higher wage rate ranges, that each employe would automatically enjoy a wage increase at a rate which would be in the same relative position or grade in the new wage range as his former rate had in the old range. It is these increases which were the subject of the War Labor Board's directive and which ultimately were assumed by the company in settlement of the strike. It is not suggested that there was any understanding in writing to this effect. The contention is that such agreement was made verbally when the parties agreed upon the new schedule of wage ranges operating prospectively. Neither the War Labor Board nor the Unemployment Compensation Board of Review made any finding as to whether there actually was an agreement to the above effect. But since the appellant, who had the burden of proving the existence of an agreement failed to satisfy

both Boards that it was made, the absence of a finding on the subject is equivalent to a finding that no such agreement was made. The company's evidence is that there was no such understanding nor an agreement between the company and the union that they would be bound by the determination of the War Labor Board. Perhaps the most convincing evidence that no agreement subsisted between the union on behalf of its members, and the company, is the fact that a strike was called. We are not impressed with the argument that the purpose of the strike was merely to prevent the removal of company property from the premises, thereby lessening the security of the employes for the payment of their claims. The strike was called to enforce the payment of retroactive wage demands; banners carried by strikers in the picket line bore the legend: "We want our back pay". The company did pay such increases in wages as it admittedly agreed to do and the Board so found. It did not agree to the retroactive payments of additional wages contemplated by the War Labor Board's directive.

Under §402(d) of the 1945 Act temporary disqualification of an employe results from "voluntary suspension of work resulting from an industrial dispute". And appellant concedes that the present unemployment resulted from a labor dispute but he contends that the suspension of work was not voluntary. No other question is involved in this proceeding and under the findings, amply supported as they are by the evidence, the Board was fully justified in its conclusion that claimant's unemployment was due to his voluntary suspension from work resulting from a labor dispute.

If the employes were entitled to the wage increases under an agreement with the company, suits in assumpsit would have afforded an adequate remedy under a normal procedure. On the assumption of the existence of an agreement, since the employes suspended work and

acted in concert to prevent the continuance of operations without resorting to available legal measures to collect their claims, their suspension of work was voluntary under the holding of *Miller v. Unemp. Comp. Board,* 152 Pa. Superior Ct. 315, 31 A. 2d 740. And irrespective of any agreement, if we adopt the view, supported by ample authority,[1] that an order of the War Labor Board is not mandatory, but directive merely, the unemployment in this case nevertheless must be regarded as voluntary. Under a prior Act in construing the phrase "Voluntarily leaving work" we said in *Lab. & Ind. Dept. v. Unemp. Comp. Board,* 133 Pa. Superior Ct. 518, 3 A. 2d 211: "The word, 'voluntarily', may be used in a number of different senses, but, in our opinion, having regard to the purpose and intent of the act, considered as a whole, but with special reference to its declaration of public policy (section 3) and its fourth article, which prescribes the qualifications required to secure compensation and enumerates the causes which will make an employe ineligible for compensation, the most appropriate meaning or definition is, 'Of one's own motion' (Century Dictionary); 'of one's own accord' (Oxford Dictionary); 'acting of one's self' (Webster's New International Dictionary). When we say, 'He left work voluntarily,' we commonly mean, he left of his own motion; he was not discharged. It is the opposite of a discharge, dismissal or lay-off by the employer or other action by the employer severing relations with his employes, to provide against which the act was mainly designed. This meaning of the term is easily applied, is of general significance and obviates the necessity of an inquiry or examination into the mental processes of the employe which led up to or brought about his resig-

---

[1] *Employers Group of Motor Freight Carriers, Inc., v. N. W. L. B.,* 143 Fed. (2d) 145, 148, 149 (1944), Cert. denied 323 U. S. 735; *N. W. L. B. v. Montgomery Ward and Co., Inc.,* 144 Fed. (2d) 528 (1944), Cert. denied, 323 U. S. 774.

nation or quitting work of his own motion, the result of which might or might not be deemed voluntary as considered by different persons, from different points of view, and thus be variable and subject to no uniform standard". Section 402(d) of the 1945 Act with which we are here concerned, was construed in *Stillman Unemployment Comp. Case,* 161 Pa. Superior Ct. 569, 56 A. 2d 380, by Judge RENO thus: "In this section 'voluntary' has not been modified in subsequent amendments by 'good cause', and such cases as Teicher Unemployment Compensation Case, 154 Pa. Superior Ct. 250, 35 A. 2d 739; Sturdevant Unemployment Compensation Case, 158 Pa. Superior Ct. 548, 45 A. 2d 898, and others of like import, are irrelevant. 'Voluntary' in this context connotes a suspension of work resulting from the decision of the employe, as distinguished from a dismissal or discharge or lay-off by the employer. Cf. Department of Labor and Industry v. Unemployment Compensation Board of Review, 133 Pa. Superior Ct. 518, 3 A. 2d 211. The task of the board was to ascertain from the evidence whether appellants' suspension of work was due to their decision or to some action by their employer." The suspension of work here was not due to any act of the employer. As to current wages the employer had complied with the demands of the union. And during the entire period of the strike work was available to all employes on currently acceptable terms and conditions. No new condition was injected into the terms of the collective bargaining agreement by the employer.

Claimant's unemployment in this case clearly was due to a *voluntary* suspension of work resulting from an industrial dispute and he accordingly was ineligible for compensation for the period involved under §402(d) of the 1945 Act.

Order affirmed.