## Mehlbaum Unemployment Compensation Case.

498

Argued March 8, 1954. Before RHODES, P. J., ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ.

*Moses K. Rosenberg,* with him *Sidney G. Handler* and *Douglass, Handler, Rosenberg & Ware,* for appellants.

*William L. Hammond,* Special Deputy Attorney General, with him *Frank F. Truscott,* Attorney General, for appellee.

*E. Mac Troutman,* with him *Penrose Hertzler,* for intervenor, appellee.

OPINION BY WRIGHT, J., July 13, 1954:

John C. Mehlbaum and ninety-two other individuals (hereinafter referred to as the claimants) were production workers and employes of the Philadelphia and Reading Coal and Iron Company, Pottsville (hereinafter referred to as the employer), which operates collieries at and known as Alaska, Locust Gap and Reliance, Pennsylvania. Claimants were all members of the United Mine Workers of America (hereinafter referred to as the union), which organization is their exclusive representative for the purposes of collective bargaining. The terms and conditions of employment were prescribed by a collective bargaining agreement between the union and the employer. This contract, although providing for holidays, did not designate Easter Monday in any year as a holiday. The employer in 1943, and continuing through 1948, scheduled work at the aforesaid collieries on Easter Monday of each year. During those years fire bosses reported and inspected the mines in preparation for the employes to come to work, and other supervisory employes likewise reported to the mines on said day, but the production employes at the several collieries in question failed to report for work on Easter Monday.[1] In the years 1949, 1950, and 1951, the employer did not schedule any work on Easter Monday. On April 9, 1952, the employer posted the following notice at each of the collieries: "Easter Monday—April 14th, 1952: P. & R. Mines will be idle Monday, April 14th, 1952, because colliery employees, as usual, are refraining from work on this day". The following news release was placed by the employer in the Mt. Carmel Item with a date line of April 10, 1952: "Philadelphia and

---

[1] Except that some production workers at the Reliance and Locust Gap collieries did work on Easter Monday, 1943.

Reading Coal and Iron Company made a special announcement today regarding the working schedule for the Easter holiday season. 'All P & R mines will be idle tomorrow because of the observance of Good Friday,' the announcement stated. 'Because colliery employes are refraining from work Easter Saturday, April 12, the mines are not scheduled to operate that day, either. Easter Monday, the mines will again be idle because of colliery employes refraining as usual from work this day' ".

Claimants filed applications for partial benefits for the claim week ending April 16, 1952. There was testimony on the part of the employer that work would have been furnished that week on Easter Monday, had claimants indicated that they were willing to work on that day. If claimants had worked on Easter Monday, the remuneration paid or payable for the week in question would have exceeded their weekly benefit rate.[2] The claims were allowed by the Bureau, affirmed by the Referee, but reversed and partial benefits denied by the Unemployment Compensation Board of Review. This appeal followed.

The controlling issue is whether the claimants, after taking a positive position of not reporting for work on Easter Monday for a period of nine years, can now assert that their unemployment on that day in 1952 was involuntary, when the employer could and would have furnished work had claimants indicated their willingness to work. It is the position of their counsel that claimants were unemployed involuntarily on Easter Monday in view of the action of the em-

---

[2] Claimants did not work from April 10, 1952, to April 14, 1952, inclusive. They did work the remaining two days of that work week, viz., April 15, and April 16, 1952, earning a total of $28.78 each. Their claims are for the difference between that amount and their weekly benefit rate of $30.00.

ployer in not scheduling work for that day. He argues that "the record is devoid of any evidence of any duty, obligation or practice on the part of the employees or their representatives to notify the employer of their willingness or desire to work". On the other hand, the position of the employer is that it was under no obligation to make the idle gesture of scheduling work on Easter Monday when claimants had of their own volition established a customary practice of not working on that day. Counsel for the employer therefore contends that the Board was correct in concluding under the circumstances that claimants "were voluntarily unemployed".

Section 402(b) of the Unemployment Compensation Law,[3] provides that "An employee shall be ineligible for compensation for any week . . . In which his unemployment is due to voluntarily leaving work without good cause . . ." The term "voluntary unemployment" is not defined in the Act. However, in the case of *Labor and Industry Department v. Unemployment Compensation Board of Review,* 133 Pa. Superior Ct. 518, 3 A. 2d 211, we stated: "When we say, 'He left work voluntarily', we commonly mean, he left of his own motion; he was not discharged. It is the opposite of a discharge, dismissal or lay-off by the employer or other action by the employer severing relations with his employes, to provide against which the act was mainly designed". See also, *MacFarland v. Unemployment Compensation Board of Review,* 158 Pa. Superior Ct. 418, 45 A. 2d 423. In the present case we have a situation in which the employer had, for a period of six years, held the collieries open and ready for work on Easter Monday, but the employes failed in concert

[3] Act of December 5, 1936, P. L. (1937) 2897, as amended, 43 P.S. 802(b).

to report for work on that day. In light of this established pattern, the employer during the next three years discontinued the practice of preparing the mines for operation on Easter Monday. In carrying out the same policy in 1952, the employer publicized the fact that on April 14, the collieries would be idle, and expressly stated the reason. As found by the Board, the failure of the employer to schedule work on that date was due to "the refusal of the production workers to report for work on Easter Monday in prior years", and "the employes were aware of the publicized notice but at no time indicated to the employer a willingness to work on Easter Monday".

Appellants contend that there was no duty on the part of the claimants to notify the employer of their willingness to work,[4] stressing the fact that the union, the only recognized collective bargaining agent of the claimants, was not contacted by the employer with regard to the matter. We feel that this argument lacks substance when viewed in a practical light. It overlooks the inescapable fact that a common understanding arose out of claimants conduct over a period of years, by reason whereof their intention not to work on Easter Monday was properly implied. The language of the posted notice and the news release so indicated, and in no way warranted an inference that the collieries would be idle because of the inability of the employer to furnish work. Had there been a change of heart on the part of the employes, the duty devolved upon them to inform the employer of such alteration in policy. To say that the employer should have notified the union and negotiated with it before not scheduling work merely begs the question. We are of the

---

[4] Claimants do not assert that they would have reported for duty had work been scheduled.

opinion that the employer was justified in relying on the past practice. Since the policy of not working on Easter Monday had been initiated by the employes, the burden was upon them to request work on that day, rather than for the employer to contact the union or to once again go through the vain procedure of preparing the collieries for work.

We must not lose sight of the purpose of the Act, as expressed in the declaration of public policy. It was designed to benefit those persons who became unemployed through no fault of their own: *Fazio v. Unemployment Compensation Board of Review,* 164 Pa. Superior Ct. 9, 63 A. 2d 489; *Barclay White Co. v. Unemployment Compensation Board of Review,* 356 Pa. 43, 40 A. 2d 336. This public policy must be considered in construing every provision of the law and in determining eligibility for compensation in every case: *Michalsky v. Unemployment Compensation Board of Review,* 163 Pa. Superior Ct. 436, 62 A. 2d 113. The Act must be construed sensibly, so that absurd results may be avoided: *Sun Shipbuilding & Dry Dock Co. v. Unemployment Compensation Board of Review,* 358 Pa. 224, 56 A. 2d 254. While the factual situation is not similar, the principles enunciated in *Mattey v. Unemployment Compensation Board of Review,* 164 Pa. Superior Ct. 36, 63 A. 2d 429, are particularly relevant. The language used in concluding the opinion sets forth the policy of the Act which must be invoked in the present case. President Judge RHODES said: "The unemployment compensation reserves established thereunder should be used for the payment of benefits to those who come within the objective of the Act. Payments must be made in accordance with its avowed purposes, and the Act must be given a realistic interpretation. The Act does not contemplate 'a compensated

vacation from work', . . . nor should it become 'an invitation to a compensated rest' ".

There can be no question that in the years 1943 to 1951 the present claimants refrained from working in violation of the union contract and, in so doing, placed themselves outside the protection of the statute: *Duquesne Brewing Co. of Pittsburgh v. Unemployment Compensation Board of Review*, 162 Pa. Superior Ct. 216, 56 A. 2d 269, affirmed 359 Pa. 535, 59 A. 2d 913. They cannot now be allowed to seize upon the notice given by the employer as the foundation upon which to base their claims for benefits.

Decision affirmed.