Westinghouse Electric Corporation, Appellant, *v.* Unemployment Compensation Board of Review. Hughes Unemployment Compensation Case.

Argued March 19, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*John G. Wayman*, with him *Reed, Smith, Shaw & McClay*, for appellant.

*Sydney Reuben*, Assistant Attorney General, with him, *Thomas D. McBride*, Attorney General, for Unemployment Compensation Board, appellee.

*M. H. Goldstein*, with him *Goldstein & Barkan*, for claimants-intervenors.

OPINION BY RHODES, P. J., September 11, 1958:

This is an appeal by the Westinghouse Electric Corporation from a decision of the Unemployment Compensation Board of Review granting compensation to claimant, Evan J. Hughes. By stipulation the deter-

mination of this appeal will govern the claims of all employes represented by the International Union of Electrical, Radio and Machine Workers, CIO (IUE); Local 111, who were involved in a work stoppage on January 19, 1954, at the Westinghouse plant, 3001 Market Street, Philadelphia. The question is whether the board properly allowed compensation on the basis that the work stoppage was a lockout within the meaning of section 402 (d) of the Unemployment Compensation Law, 43 PS §802 (d).[1]

Section 402 (d), as amended, provides in part: "An employe shall be ineligible for compensation for any week . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: . . ."

The basic facts as found by the board are not questioned. Westinghouse contends, however, that the board erred in drawing inferences from those facts, in ignoring certain undisputed facts, and in reaching its ultimate conclusion. In brief, the facts as found by the board are as follows. The employes involved are production and maintenance workers at the Westinghouse plant at 3001 Market Street, Philadelphia. They became unemployed on January 19, 1954, when they ceased work in protest against the promotion of three employes. The employes are members of Local 111 of the International Union of Electrical, Radio and Machine Workers, CIO (IUE), and until November 4, 1949, had been affiliated with the United Electrical,

---

[1] The bureau and the referee allowed compensation benefits. The company appealed to the Board of Review on March 17, 1955; the board's decision is dated August 6, 1957. Claims were paid before review by the board. See *Pennsylvania State Chamber of Commerce v. Torquato*, 386 Pa. 306, 125 A. 2d 755.

Radio and Machine Workers (UE) which was expelled from the CIO. Prior to the expulsion of the United Electrical, Radio and Machine Workers from the CIO there had been in effect between the union and Westinghouse a national labor relations agreement and a local supplement thereto entered into on August 7, 1947. After the expulsion the successor union, International Union of Electrical, Radio and Machine Workers, entered into a new national agreement with Westinghouse effective October 1, 1950. This national agreement provided for continued negotiations between Westinghouse and the local for the purpose of concluding local supplements to the national agreement covering terms and conditions of employment relating to the local plant. In accordance with the national agreement Local 111 and Westinghouse conducted negotiations from 1951 until February, 1953, in an effort to reach an agreement on the local supplement. Westinghouse submitted a proposed local supplement which contained certain provisions different from those in the previous 1947 local supplement, but this proposal was rejected by the union.[2] On March 13, 1953, Westinghouse notified all employes represented by Local 111 that, effective March 16, 1953, it would apply a set of policies as outlined in the proposed supplemental agreement. On June 3, 1953, Westinghouse applied the seniority provisions of the new policy in the case of one of the employes. The local filed a grievance report, in accordance with the provisions of the national agreement, protesting the company's action, and notified Westinghouse that the policies contained in the proposed local supplement would not be accepted or recognized by the union. On October 21, 1953, West-

---

[2] The proposed local supplement was initially accepted, with certain agreed modifications, by Local 111, but was rejected by the national organization.

inghouse applied the provisions of the proposed local supplement in the case of another employe who was being laid off. Local 111 filed a grievance and the matter was settled at the local level. On November 9, 1953, the company again applied the provisions of the proposed local supplement in the case of another employe in permitting him to displace an employe in a lesser class. This matter also was amicably settled after the local filed a grievance. On January 15, 1954, due to an increase in the volume of business, Westinghouse informed the union chief steward that it would upgrade three employes in a certain group. On January 18, 1954, the foreman advised the chief steward that the three employes had been promoted. The chief steward replied to the foreman that these particular employes were not entitled to be selected for the promotions under the conditions of employment and policies embodied in the 1947 local supplement, and requested that the upgrading be held in abeyance pending a discussion by the grievance committee of Local 111 with local management. On January 19, 1954, the recording secrtary of the local was informed that the three employes had been entered on the payroll in the new classifications. The union officials again requested that the upgrading be held in abeyance pending a discussion by the grievance committee and local management, but they were informed that the action would not be rescinded. The union officials returned to their work stations and advised the other employes in the department of their conversations with the company officials. At 8:30 p.m., after the lunch period, employes on the second shift left the plant. They refused to return to work, and on the morning of January 20, 1954, pickets were stationed at the plant entrance. The union grievance committee called upon company officials for the purpose of discussing the dispute, but the

company officials refused to consider the matter until the employes returned to work. On January 21, 1954, the negotiating committee of the union met with representatives of management and presented a proposal setting forth the following conditions under which the employes would return to work: "1. Management to withdraw the policies set forth in the proposed Local Supplement dated March 16, 1953. 2. Negotiate a new Local Supplement. 3. In the interim period, reinstate the policies and practices in effect prior to March 16, 1953." Management agreed to negotiate a new local supplement, but it would not agree to withdraw the policies adopted March 16, 1953, or to reinstate the policies and practices in effect prior thereto. Meetings were held by the Federal Mediation and Conciliation Service beginning January 26, 1954, and by February 27, 1954, an agreement was reached on all matters to be covered by the local supplement. On March 1, 1954, the agreement was signed and the work stoppage ended.

From these findings the board concluded that the work stoppage was due to a lockout and compensation was allowed.

Findings of fact made by the compensation authorities are binding on appeal if supported by the evidence. *McGinnis Unemployment Compensation Case,* 184 Pa. Superior Ct. 95, 101, 132 A. 2d 749. The basic findings in this case are not in dispute. Our review is to determine whether the conclusion reached by the board is supported by its findings. See *Martinez Unemployment Compensation Case,* 186 Pa. Superior Ct. 50, 51, 140 A. 2d 351.

Where the unemployment for which compensation is sought resulted from a labor dispute, the controlling question is whether the final cause and responsibility or fault for the work stoppage, within the meaning of the policy section of the Law (section 3, 43 PS §752)

lies with the employer or with the employes. *McGinnis Unemployment Compensation Case,* supra, 184 Pa. Superior Ct. 95, 101, 132 A. 2d 749; *Morris Unemployment Compensation Case,* 169 Pa. Superior Ct. 564, 568, 83 A. 2d 394. If the employes strike, that is, if they make a concerted refusal to do any work for the employer until the object of the strike is attained, the resulting unemployment is not compensable; where the employer withholds work from his employes in order to gain a concession from them the work stoppage is considered a lockout and is compensable. *Byerly Unemployment Compensation Case,* 171 Pa. Superior Ct. 303, 308, 90 A. 2d 322. "The gist of a lock-out is an employer's withholding of work from his employes in order to gain a concession from them. It may be evidenced by closing the plant or by other acts which evince the purpose of forcing employes to accept onerous terms of employment." *Burleson Unemployment Compensation Case,* 173 Pa. Superior Ct. 527, 533, 98 A. 2d 762, 766.

In determining the final responsibility for the work stoppage, the justification for the act of the employer which precipitated the strike or the justification for the demands of the employes is generally not considered by the compensation authorities or by this Court. *Leto Unemployment Compensation Case,* 176 Pa. Superior Ct. 9, 15, 106 A. 2d 652; *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 561, 83 A. 2d 386. Although the employes may be justified in a given situation in refusing to work for collective bargaining reasons, the work stoppage may still be a strike for unemployment compensation purposes. *Hogan Unemployment Compensation Case,* supra, 169 Pa. Superior Ct. 554, 563, 83 A. 2d 386. But, while the compensation authorities may not inquire into the reasonableness of the offers or demands of the parties

to the labor dispute, there must of necessity be an inquiry into the reasonableness of the action of the employes in ceasing to work under the circumstances or the reasonableness of the action of the employer in withholding work. Thus, where an employer changes or modifies the terms and conditions of employment, express or implied, under an existing contract, and the employes cease work because of the resulting dispute without resorting to available legal remedies or remedies provided under the contract, their action is not reasonably indicative of a desire to remain employed and compensation is denied.[3] See *Arbechesky Unemployment Compensation Case,* 174 Pa. Superior Ct. 217, 222, 223, 100 A. 2d 396; *Miller v. Unemployment Compensation Board of Review,* 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740. Likewise, where the employer closes his plant in anticipation of a strike, his action must be subjected to the test of reasonableness, that is, whether under the circumstances the anticipated strike was reasonably imminent and impending. In the *McGinnis Unemployment Compensation Case,* supra, 184 Pa. Superior Ct. 95, 102, 132 A. 2d 749, we held that the employer in closing his plant did not have a reasonable ground for believing that a strike was imminent, while in the *Lavely Unemployment Compensation Case,* 166 Pa. Superior Ct. 481, 72 A. 2d 300, it was determined that the employer did have reasonable ground for believing that the anticipated strike was impending. The primary function of the compensation authorities and of this Court concerns only the validity of the claim for compensation as the Legislature has determined that unemployment is compensable or noncompensable. An essential question is whether the

---

[3] See *Almada v. Administrator, Unemployment Compensation Act,* 137 Conn. 380, 77 A. 2d 765, 771; 81 C.J.S., Social Security and Public Welfare, §188, pp. 281, 282.

employes are "unemployed through no fault of their own."

By section 402 (d) of the Law, 43 PS §802 (d), the Legislature clearly provided that unemployment resulting from a labor dispute was not compensable in the absence of a lockout, because the Unemployment Compensation Fund is not to be used to encourage employes to voluntarily cease work and become unemployed. Where a lockout exists the unemployment is involuntary on the part of the employe and is compensable. In cases of an ordinary strike, that is, where employes walk off the job, or in cases of an ordinary lockout, that is, where the employer closes the plant, the determination is not difficult. But difficulties arise where either of the above situations is complicated by claims that a strike becomes or is actually a lockout or a lockout becomes or is actually a strike because the employer or employes forced the work stoppage upon the other by certain actions. The compensation authorities here concluded, in effect, that the employes were forced to strike by the action of the employer. The board stated: "We think it is clear that the employer unilaterally attempted to change the existing terms and conditions of employment when it announced on March 13th that the provisions of the 'proposed Local Supplement' would be enforced on and after March 16, 1953. The facts show that the company on several occasions attempted to enforce the provisions of this proposed Local Supplement. The union resisted the enforcement of these changes in working conditions and through the filing of grievances was able to have amicable settlements of the various proposed actions. On January 18, 1954, the company again applied the provisions of the proposed Local Supplement and after the employees began a work stoppage in protest against this action, the company re-

fused to permit them to return to work unless they abided by the changed working conditions until a new Local Supplement could be completed. Inasmuch as the employees were willing to continue working under the pre-existing terms and conditions of employment, but the company refused them this opportunity, we think that this labor dispute must be classed as a lockout."

While the board did not expressly refer to the *Leto Unemployment Compensation Case,* supra, 176 Pa. Superior Ct. 9, 106 A. 2d 652, it actually applied the holding of that case, that is, the maintenance of pre-existing terms and conditions of employment for a reasonable time pending settlement of a labor dispute, as the sole and universal rule in work stoppage cases.

It is generally true that a work stoppage may be a lockout where a collective bargaining agreement has expired or is about to expire and the employer refuses to permit work to continue under the pre-existing terms and conditions of employment for a reasonable time in order to avert a work stoppage pending settlement of the labor dispute. *Leto Unemployment Compensation Case,* supra, 176 Pa. Superior Ct. 9, 15, 106 A. 2d 652; *McGinnis Unemployment Compensation Case,* supra, 184 Pa. Superior Ct. 95, 132 A. 2d 749. Cf. *Burleson Unemployment Compensation Case,* supra, 173 Pa. Superior Ct. 527, 530, 531, 533, 98 A. 2d 762.

But, while a collective bargaining agreement is in force, a strike does not become a lockout merely because an employer takes some action which the employes believe to be erroneous or contrary to their rights, express or implied, under that agreement. Employes who cease working because of a labor dispute founded upon an alleged breach of contract by the employer are not always entitled to benefits. *Byerly Unemployment Compensation Case,* supra, 171 Pa. Supe-

rior Ct. 303, 309, 90 A. 2d 322. The holding of the *Leto* case—that the employer continue to furnish work on the pre-existing terms and conditions of employment for a reasonable time to avert a work stoppage—is not so conclusive on the question of final responsibility in all cases or so broad in scope that every action taken by the employer is such a change in the terms and conditions of employment that would permit the employes to strike at the expense of the Unemployment Compensation Fund. The purpose of the Unemployment Compensation Law must be considered in formulating some basis for distinguishing between a strike and a lockout in most cases. As we stated in *Mehlbaum Unemployment Compensation Case,* 175 Pa. Superior Ct. 497, 503, 107 A. 2d 141, 143: "We must not lose sight of the purpose of the Act, as expressed in the declaration of public policy. It was designed to benefit those persons who became unemployed through no fault of their own: . . . This public policy must be considered in construing every provision of the law and in determining eligibility for compensation in every case: . . . The Act must be construed sensibly, so that absurd results may be avoided: . . ." Although we do not find many cases involving the issue of strike versus lockout which are helpful in determining what changes in terms and conditions of employment are sufficient to make a strike a lockout for benefit purposes, it is clear and consistent with the purpose of the Law that not every change instituted by an employer which precipitates a work stoppage creates a situation of compensable unemployment. Proof of a lockout is not necessarily established by evidence that the employer imposed terms of employment which allegedly compel the employes to work under less favorable conditions than those which the employer was bound to supply under its contractual obligation (*Arbechesky Unemployment*

*Compensation Case,* supra, 174 Pa. Superior Ct. 217, 222, 100 A. 2d 396) or under terms which the employes allege were less advantageous than those contained in a prior contract (*Hogan Unemployment Compensation Case,* supra, 169 Pa. Superior Ct. 554, 561, 83 A. 2d 386). The function of the compensation authorities is not merely to make a perfunctory observation of all the terms and conditions of employment existing prior to the work stoppage and determine whether every term and condition, no matter how insignificant, has remained unchanged at the hands of the employer pending settlement thereof. An employer is not required to operate his plant in a vacuum, without change or improvement, in order that he might keep his employes on the job. That is not the intent of the Unemployment Compensation Law, and the *Leto* case does not propound such an arbitrary, mechanical, and comprehensive rule for the determination of the issue in contravention of the requirements of the Law. Accordingly, in *Byerly Unemployment Compensation Case,* supra, 171 Pa. Superior Ct. 303, 90 A. 2d 322, where the work stoppage resulted from an alleged breach of contract by the employer in refusing to pay a union steward for time spent investigating a grievance, we held that the strike was not a lockout for unemployment compensation purposes. Certainly, if the contract in the *Byerly* case provided for the payment of stewards while investigating grievances, such provision may be considered a "term or condition of employment"; but the alleged violation of this term or condition of employment by the employer was not sufficient to permit the employes to choose unemployment, with payment of benefits, as the only alternative to continued employment pending settlement of the dispute. Also, in the *Arbechesky Unemployment Compensation Case,* supra, 174 Pa. Superior Ct. 217, 100 A. 2d 396, where em-

ployes ceased working because of an alleged breach of contract by the employer in refusing to make certain payments toward the union's health and welfare fund, we held that the work stoppage was not a lockout notwithstanding a contention of the employes that they were compelled to work under conditions less favorable than those to which they were entitled under the contract.[4] If, as the board has in effect now concluded, an employer who changes or modifies in any respect the broad terms and conditions of employment and refuses to rescind that action pending settlement of the resulting disagreement with the employes thereby creates a lockout, it would seem to follow that such an unrescinded change in the terms and conditions of employment would form the necessitous and compelling reasons justifying a voluntary quit under section 402 (b) of the Law, 43 PS §802 (b). This is not the rule either in a voluntary quit case or in every labor dispute case. For example, in the *Pusa Unemployment Compensation Case,* 178 Pa. Superior. Ct. 348, 352, 115 A. 2d 791, we held a claimant ineligible for benefits when he quit because he was transferred to other work with a reduction in wage. We there stated (page 352 of 178 Pa. Superior Ct., page 793 of 115 A. 2d): "Claimant had a right to refuse the employment, but it does not follow that the change in the nature of the work and the reduction in wages in these circumstances placed claimant in a position whereby he could resign with good cause and thus create a status of unemployment within the purview of the law." The actions of the employer and the employe must be subjected to the test of a reasonable desire to maintain the employment status. If the fault is attributable

---

[4] See *Almada v. Administrator, Unemployment Compensation Act,* 137 Conn. 380. 77 A. 2d 765, 771, 81 C.J.S., Social Security and Public Welfare, §188, pp. 281, 282.

to only one, the result is either a lockout or a strike; if the fault is attributable to both, compensation must be denied because the Law was enacted for the benefit of persons "unemployed through no fault of their own."

The findings of fact of the board in the present instance establish beyond question that the employes ceased working because they did not agree with the company that the three employes who were upgraded were the proper employes for the promotions. Work was available to the employes who went out on strike because of this labor dispute on the same terms and conditions existing prior to the strike with the sole exception that three employes were promoted. Only the three employes who claim to have been ignored in the promotions were directly affected; the balance of the employes could only be said to have been affected indirectly in the sense that the action of the company failed to abide with the broad seniority provisions of the terms of employment. The promotion of three employes in preference to three other employes was at most a matter calling for redress under the contractual provisions relating to the settlement of disputes or resort to the available legal measures. These remedies were available. Although there was no local supplement to the national agreement effective October 1, 1950, there was provision in the national agreement concerning the upgrading of employes on the basis of seniority as well as a procedure for settlement of disputes. These procedures the union refused to follow to a conclusion before going on strike even though it followed the same procedures in at least two prior instances in which the policies introduced by the company on March 13, 1953, resulted in a dispute between management and labor.

Employes who claim that the employer has breached the obligations of his contract must pursue the reme-

dies provided therein (*Glen Alden Coal Company v. Unemployment Compensation Board of Review,* 168 Pa. Superior Ct. 534, 536, 79 A. 2d 796) or the available legal remedies (*Cassell Unemployment Compensation Case,* 167 Pa. Superior Ct. 440, 445, 446, 74 A. 2d 809; *Morris Unemployment Compensation Case,* supra, 169 Pa. Superior Ct. 564, 569, 83 A. 2d 394). If the alleged disregard of the seniority rights by reason of the promotion of three employes would have resulted in irreparable damage to the union or the other employes in violation of the express or implied conditions of the contract, there was available a remedy in equity. *General Building Contractors' Association v. Local Union No. 542,* 370 Pa. 73, 79, 87 A. 2d 250; *Philadelphia Marine Trade Association v. International Longshoremen's Association, Local Union No. 1291,* 382 Pa. 326, 115 A. 2d 733; *King Unemployment Compensation Case,* 183 Pa. Superior Ct. 629, 633, 133 A. 2d 581; *Arbechesky Unemployment Compensation Case,* supra, 174 Pa. Superior Ct. 217, 222, 223, 100 A. 2d 396. As we said in *Miller v. Unemployment Compensation Board of Review,* supra, 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740, 743: "The Unemployment Compensation Law was not intended to promote stoppages of work by employees because of disputes with employers or bargaining agencies, which could be legally determined without any cessation of work. The fundamental idea of the Act is to provide a reserve fund to be used for the benefit of persons *unemployed through no fault of their own.* To call a suspension of work and act in concert to prevent a continuance of operations, without resorting to the legal measures open to determine the rights of the parties, amounts to a voluntary suspension of work, with the necessary consequences provided in the Act."

In the present case the board found that the employes would have returned to work had the company recalled the policies put into operation on March 16, 1953; and it concluded that by refusing to accede the company constructively locked out the employes. The arbitrary insistence on acceptance of the terms and conditions of employment in existence before March 13, 1953, ten months prior to the strike, as those which the company was required to maintain throughout extended negotiations for a new local supplement, cannot be sustained. The national agreement became effective on October 1, 1950, and, as the board found, Westinghouse and Local 111 conducted negotiations from 1951 until February, 1953, in an effort to reach an agreement on the local supplement. Certainly the maintenance of the same terms and conditions of employment from 1951 until February, 1953, by the company would more than amply fulfill any requirement under the *Leto* case that an employer maintain the pre-existing terms and conditions of employment for a reasonable time during negotiation of a new contract.[5] Moreover, the introduction of the policies on March 13, 1953, was not the incident which was the final cause of the work stoppage. Those policies were in effect for ten months during which time questions arose with respect thereto, which questions were settled between labor and management without interruption of employment. Under the findings of the board it is clear that the work stoppage was not precipitated by what occurred on March 13, 1953, but by the promotion of three employes in January, 1954. Employ-

---

[5] The situation is to some degree complicated by the fact that there was a national agreement signed and in effect but no new local supplement. Although the national agreement was not explicit in every detail it clearly provided a grievance procedure which should have been employed instead of going on strike.

ment was available to all employes at the wages and on the terms of employment prevailing at the time they went out on strike with the sole exception that three employes were promoted. As in the *Byerly Unemployment Compensation Case,* supra, 171 Pa. Superior Ct. 303, 309, 90 A. 2d 322, this was at most a breach by the employer of the express or implied[6] terms of employment, and it was not a case where the employer insisted on onerous terms as a condition of continued employment amounting to a withholding of work. The fundamental error of the board was in giving the factual holding of the *Leto* case the status of a universal, arbitrary, mechanical rule. The *Leto* case merely holds that it was unreasonable for that employer to refuse to permit work to continue on the same terms and conditions of employment as the expiring contract for a reasonable time to avert the work stoppage. Here it was unreasonable for the employes to refuse to continue working for a reasonable time until the purported breach of contract could be settled by the grievance procedure, or by resort to the legal measures. This refusal was the final cause of the work stoppage.

The decision of the Board of Review is reversed.

---

[6] The breach of an implied condition of employment should be remedied through the available contractual, legal, equitable, or administrative procedures, not by the payment of benefits. *Morris Unemployment Compensation Case,* 169 Pa. Superior Ct. 564, 568, 569, 83 A. 2d 394.