Parise Unemployment Compensation Case.
Punxsutawney Company, Appellant. *v.* Unemployment Compensation Board of Review.

Argued December 15, 1958.   Before RHODES, P. J., GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (HIRT, J., absent).

*Jesse P. Long,* for employer, appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for Unemployment Compensation Board, appellee.

*James Crag Kuhn, Jr.,* with him *Arnold D. Wilner,* and *Wilner, Wilner and Kuhn,* for claimants, intervening appellees.

OPINION BY WOODSIDE, J., March 18, 1959:

This is an appeal by The Punxsutawney Company from a decision of the Unemployment Compensation Board of Review allowing compensation to the company's employes.

The bureau and referee denied the claimants, Frank Parise and Devere Allen Kendall, compensation on the ground they were out of employment "because of a labor dispute other than a lock-out," but the board concluded that the work stoppage was a lock-out, and allowed compensation to the claimants and their fellow employes. The Parise Case rules the claims of 17 fellow employes whose last day of employment was November 29, 1957, and the Kendall Case rules the claims of 14 employes whose last day of employment was November 7, 1957.

All of the above claimants were members of the International Union of Electrical, Radio and Machine Workers, A.F.L.-C.I.O. The union had a collective bargaining agreement which provided: "Duration of this contract shall remain in effect until midnight October 31, 1957, and shall continue in effect for periods of one (1) year to one (1) year unless either party gives the other party sixty (60) days written notice prior to October 31, 1957 of its intention to terminate or modify the same."

On August 1, 1957, the union notified the company of its desire to modify the agreement in respect to wages, hours, working conditions and other contractual provisions. On October 23, the union made demands for a "substantial wage increase," pension, insurance, additional holidays, night premium pay, improved vacation and supplemental unemployment benefits.

The parties not having agreed upon the terms of a new contract on October 31, the union asked for an indefinite extension of the contract then in force, with a further request that the provisions of any new contract would be retroactive to November 1, 1957. The company agreed to extend the existing contract to November 15, 1957, and to make the provisions of a

new contract retroactive to November 1. Subsequently, the contract was again extended, with the retroactive agreement, to November 22, and again to November 27.

Until November 13, 1957, the company showed no signs of wanting any changes in the existing agreement, but at that time it presented a new section on grievance procedure. The company did not request its employes to take any reduction in wages, but it did insist on deleting incentive grievances from arbitration. The company's proposal concerning grievance procedure and arbitration was not satisfactory to the union.

On November 27, the employer refused to grant the request of the union for another extension of the contract.

"On the morning of November 29," testified Charles Copeland, union representative, "I went to the plant gates to tell the men the status and the position which the union was in at that particular time . . . And they voted not to work with no contract." Although the employes were then at the plant gate, "They did not go to work that morning."

Sam Catanese, a claimant, testified, "There was a vote taken not to enter the plant under those conditions."

A sign was posted stating that there was a strike, but later it was replaced by another sign on which appeared, "Local 642, IUE-AFL-CIO, Locked Out."

On December 3, 1957, the employer notified the employes by mail, newspaper, and radio as follows: "Work is available at the Punxsutawney Company to all employees under the conditions existing at the time of the expiration of the last contract on October 31, 1957.

"This notice is prompted by the allegation of IUE representatives that the present work stoppage is a

'lockout' even though strike notices were posted but later removed.

"Signed The Punxsutawney Company."

Frank Pugliano testified that after learning of the above notice, "I asked Mr. Buffington ['owner' of the company] what he meant by the same conditions that existed on October 31, 1957, and . . . his answer was: 'He had made a proposal through Mr. Long [his lawyer] and that was it.' " Pugliano further testified concerning this conversation with Buffington, "He told me personally the men would have to return to work under the conditions of the final proposal that was submitted to us as a union." None of the union employes returned to work. The record does not show that claimant Parise testified. Claimant Catanese testified, "I've worked in that plant with a contract. How am I going to work without a contract? If the company was willing to go along with the contract or the provisions or protection I had under the old contract, yes . . . I wasn't willing to work without a contract, but I was willing to work with an extension of the old contract."

During the work stoppage of the production employes, all of whom were members of the union, the "white collar" employes continued to work.

Although the company had not requested its employes to take any reduction in wages, the union contends that deleting incentive grievances from arbitration "could very well mean a hefty pay cut," because "the only resort that the union had in order to settle such a grievance after the regular grievance procedure was exhausted would be to strike: . . . It would amount to a decrease in pay if they had to strike."

There was a past history of unsatisfactory labor relations between the employer and the union which had some bearing on the work stoppage. Pugliano tes-

tified, "I think the overall cause of the labor disputes dates back to over a year ago." There was an arbitration of a grievance, and "The company . . . refused to abide by the decision of the Arbitrator." Because of this and other grievances there had been a three day strike in July. These grievances were not settled, and were also involved in the negotiations and discussions leading up to the work stoppage.

The claimants had not returned to work at the time of the hearings on these claims, and testimony was presented of negotiations and events occurring subsequent to the weeks involved in this appeal which we have not related.

Claimant Kendall, a member of the union, received a layoff notice due to lack of work on November 7th. His eligibility for unemployment compensation in November was not questioned. He received word "to report to work on December 3rd" but he "knew there was a labor dispute at the plant . . ." and testified, "I felt that I was being called back to work to be more or less a guinea pig for the other employees that were also out of work." From picket line "gossip" he learned "that we would have to go back for less than what we had left for." He did not report for work although he knew "we were eligible to go back to work."

Summarizing the above testimony, all given by the claimants or union representatives,[1] it appears that the contract of employment would have continued had not the union served notice on the employer of their desire to negotiate a new one; that the employer agreed in writing on three successive occasions to extend the contract and make the provisions of a new contract retro-

---

[1] The "owner" and plant superintendent testified for the employer, but we have confined the stated facts to the testimony presented by the claimants, because the board resolved conflicting testimony in their favor.

active to November 1; that on November 29th the employer refused to extend the contract, and the employes thereupon voted not to work; that the employer offered employment to all his employes without renewing or extending the former contract, but under the same terms and conditions except as to grievance provisions and the employes refused to work under these conditions.

The board found, inter alia, that: "3. On December 1, 1957, the claimants were notified to return to work on December 3, 1957. Claimants did not report for work.

. . .

"8. After November 27, 1957, the claimants could continue working only under the terms and conditions proposed by the employer, which were not the same as those contained in the expired contract; hence a work stoppage occurred at 7:00 a.m., November 29, 1957."

Relying upon *Leto Unemployment Compensation Case*, 176 Pa. Superior Ct. 9, 106 A. 2d 652 (1954) the board concluded "that the employer's failure to continue to maintain the status quo precipitated the work stoppage and was the final cause thereof. Since the employer was responsible for the work stoppage, the labor dispute must be deemed a lock-out and benefits cannot be denied under the provisions of Section 402-(d) of the Law."

Section 402(d) of the Unemployment Compensation Law, 43 PS §802(d), as amended, provides in part, "An employe shall be ineligible for compensation for any week . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, or di-

rectly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute."

At the time of its decision in this case, the board did not have the opinions of this Court in the Westinghouse Cases[2] filed September 11, 1958, which restated the law that mere failure of an employer to maintain the status quo does not make a resulting work stoppage a lock-out.

In referring to an error of the board identical with the one made here President Judge RHODES said, "The error of the board in the present case was in applying the holding of the Leto case as the universal test for the determination of the final cause and responsibility or fault for the work stoppage. The Leto holding, however, is not so broad in its application. The Leto case did not expressly or by implication overrule the line of cases exemplified by the Byerly Unemployment Compensation Case, supra, 171 Pa. Superior Ct. 303, 90 A. 2d 322; nor did it purport, either expressly or by implication, to lay down a single mechanical test for determination of the final responsibility for the work stoppage.

"The duty of the compensation authorities, as we have repeatedly said, is to determine whether the em-

---

[2] *Hughes, Accurti, McCracken, Allman*, and *Gray Unemployment Compensation Cases*, 187 Pa. Superior Ct. 252; 391; 403; 416; 425; 144 A. 2d 685, 673, 679, 852, 856. The Supreme Court refused allocaturs in those cases December 26, 1958.

ployes are unemployed through no fault of their own. If the employes have acted consistently with the desire to remain employed, they are entitled to compensation under the Law to alleviate the economic burdens commensurate with unemployment . . ." *Accurti Unemployment Compensation Case,* 187 Pa. Superior Ct. 391, 144 A. 2d 673 (1958).

*Byerly Unemployment Compensation Case,* 171 Pa. Superior Ct. 303, 308, 90 A. 2d 322, is authority for the rule that if the employes make a concerted refusal to do any work for the employer until their objective is attained the resulting unemployment is a strike and not compensable, but where the employer withholds work from his employes in order to gain a concession from them the work stoppage is considered a lock-out and is compensable. See *Hughes Unemployment Compensation Case,* 187 Pa. Superior Ct. 252, 259, 144 A. 2d 685 (1958); *Vrotney Unemployment Compensation Case,* 188 Pa. Superior Ct. 405, 146 A. 2d 751 (1958).

An employer may change or modify the terms and conditions of employment and refuse to rescind that action pending settlement of the resulting disagreement with the employes without thereby creating a lock-out. *Hughes Unemployment Compensation Case,* supra, p. 265.

The question in an unemployment compensation case is not who is "right" in their demands while negotiating a labor agreement. As stated in *Hughes Unemployment Compensation Case,* supra, p. 259, "In determining the final responsibility for the work stoppage, the justification for the act of the employer which precipitated the strike or the justification for the demands of the employes is generally not considered by the compensation authorities or by this Court. Leto Unemployment Compensation Case, 176 Pa. Superior Ct. 9, 15, 106 A. 2d 652; Hogan Unemployment Com-

pensation Case, 169 Pa. Superior Ct. 554, 561, 83 A. 2d 386. Although the employes may be justified in a given situation in refusing to work for collective bargaining reasons, the work stoppage may still be a strike for unemployment compensation purposes. Hogan Unemployment Compensation Case, supra, 169 Pa. Superior Ct. 554, 563, 83 A. 2d 386. But, while the compensation authorities may not inquire into the reasonableness of the offers or demands of the parties to the labor dispute, there must of necessity be an inquiry into the reasonableness of the action of the employes in ceasing to work under the circumstances or the reasonableness of the action of the employer in withholding work."

When the claimants appeared at the factory gate on November 29, 1957, they voted not to work without contract. This was a vote to strike. At the time they could have gone to work under the terms and conditions of the company's last offer which was at the same wages, but with no right to arbitration in incentive grievances, and with no formal contract.

All of the claimants who testified at the hearing indicated that they would not work without a contract.

In *Hutchins Unemployment Compensation Case,* 187 Pa. Superior Ct. 109, 113, 114, 144 A. 2d 588, 590 (1958), we quoted with approval from *Hogan Unemment Compensation Case,* supra, 169 Pa. Superior Ct. 554, 563, 83 A. 2d 386, 391 (1951), in which we held ". . . a concerted cessation of work after the expiration of a collective bargaining agreement, in the absence of other and qualifying circumstances, is a strike. Certainly it is a strike where the Union expressly avows and acts upon the principle of 'no contract, no work!' "

In the *Hogan* case, p. 563, it was also said, "In the absence of a contract the union members were justified in refusing to work, but the refusal was nonetheless a strike."

The reason given by the claimants for their refusal to work without the arbitration agreement was that the employer might not comply with the other terms and conditions of employment and that without the arbitration agreement it would be difficult to compel it to comply with its contractual obligation.

"The employes are required to avail themselves of contractual, legal or equitable remedies for the settlement of disputes with their employers, without any cessation of work, in preference to the creation of a status of unemployment. The Unemployment Compensation Law was not intended to promote work stoppages. Miller v. Unemployment Compensation Board of Review, supra, 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740." *Accurti Unemployment Compensation Case*, 187 Pa. Superior Ct. 391, 144 A. 2d 673 (1958).

The employes feared that without a contract some of them might be discharged.

In *Gray Unemployment Compensation Case*, 187 Pa. Superior Ct. 425, 431, 432, 144 A. 2d 856 (1958) we said: "There was no basis for the employes to believe that on the day following the expiration of the contract work would not be available to them upon the pre-existing terms and conditions of employment. When they went on strike because of the failure to receive 'assurances' they did not act reasonably under the circumstances and their action was not consistent with a desire to remain employed."

The employes may have been justified in refusing to work for collective bargaining reasons, but this does not make the work stoppage a lock-out. Strikes may frequently be "justified", but they are strikes, nevertheless, and those engaged in them are ineligible for unemployment compensation under the provisions of section 402(d) of the Law, supra.

To sustain claims for benefits it must appear that the employes were "unemployed through no fault of their own." Section 3 of the Law, 43 PS§752. The Unemployment Compensation Fund is not to be used to encourage employes to voluntarily cease work and become unemployed. *Hughes Unemployment Compensation Case,* supra, p. 261. *Miller v. Unemployment Compensation Board of Review,* supra, 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740 (1943); *Accurti Unemployment Compensation Case,* supra, 187 Pa. Superior Ct. 391, 396, 397, 144 A. 2d 673 (1958); *Vrotney Unemployment Compensation Case,* supra, 188 Pa. Superior Ct. 405, 146 A. 2d 751 (1958).

"The actions of the employer and the employe must be subject to the test of a reasonable desire to maintain the employment status. If the fault is attributable to only one, the result is either a lock-out or a strike; if the fault is attributable to both, compensation must be denied because the Law was enacted for the benefit of persons 'unemployed through no fault of their own.'" *Hughes Unemployment Compensation Case,* supra, pp. 265, 266; *Vrotney Unemployment Compensation Case,* supra.

Claimant Kendall, as well as claimant Parise, is ineligible for unemployment compensation because he was a member of the same labor union which was participating in, or directly interested in, the labor dispute which caused the work stoppage.

In construing section 402(d), supra, we said: "'No person unemployed because of a labor dispute can recover unemployment compensation unless he can prove that he is not directly interested, and he is not a member of the striking union, and he is not of the same grade or class of workers as the strikers. There is no justification for the position that the three conjunctive tests are merely one tested phrased in three different

ways.' Each of these limitations of §402(d) on the right to unemployment compensation, imposed by the legislature, must be given effect. Section 51 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §551": *Curcio Unemployment Compensation Case*, 165 Pa. Superior Ct. 385, 392, 68 A. 2d 393 (1949); *Stahlman Unemployment Compensation Case*, 187 Pa. Superior Ct. 246, 144 A. 2d 670 (1958). See also *Accurti Unemployment Compensation Case*, supra, 187 Pa. Superior Ct. 391, 403, 144 A. 2d 673 (1958); *Byerly Unemployment Compensation Case*, supra, 171 Pa. Superior Ct. 303, 311, 90 A. 2d 322 (1952).

In an effort to improve their position, the claimants here brought about the termination of their contract. When the employer refused to agree to a fourth extension of the contract, the claimants voted not to work without a contract. They could have continued to work under the same terms and conditions except the provision in their contract relating to arbitration, but they refused to do so. The work stoppage which came about because of their refusal to work cannot be called a lockout.

Decisions reversed.